UNITED STATES of America, Plaintiff,

v.

Eric BRITTMAN, Defendant.

No. LR–CR–87–194.

United States District Court,
E.D. Arkansas, W.D.

May 27, 1988.

Robert L. Neighbors, Asst. U.S. Atty., Little Rock, Ark., for plaintiff.

Robert L. Adcock, Green Law Offices, Little Rock, Ark., for defendant.

## MEMORANDUM OPINION

EISELE, Chief Judge.

Mr. Eric Brittman, 26, has been convicted by a jury of robbing the East Branch of the First Commercial Bank of Little Rock, Arkansas. The indictment contained two counts, one charging the bank robbery under 18 U.S.C. § 2113 d, and the other a conspiracy to rob the bank based on 18 U.S.C. § 371. The latter count was dismissed upon motion of the government. The bank robbery count reads as follows:

> That on or about November 16, 1987, in the Eastern District of Arkansas, ERIC BRITTMAN, by force and violence and by intimidation, did take from the person and presence of Beth Aldrich $37,148 in money belonging to and in the care, custody, control, management and possession of First Commercial Bank, East Branch, Little Rock, Arkansas, the deposits of which were then insured by the Federal Deposit Insurance Corporation, and in committing the aforesaid acts ERIC BRITTMAN did put in jeopardy the life of Beth Aldrich by the use of a dangerous weapon, that is, a handgun, all in violation of Section 2113(d), Title 18, United States Code.

Since the crime occurred after October 31, 1987, the new Sentencing Guidelines would appear to control. However, Mr. Brittman has filed a motion, and later an amended motion, to have the Sentencing Guidelines declared unconstitutional.

This Court is aware that every district court in the United States has faced, is presently facing, or will soon face such challenges. It has attempted to obtain copies of the opinions already handed down, but it is also aware that it is in the interest of all concerned to have these challenges resolved by the U.S. Supreme Court as soon as possible.

For the reasons set forth below this Court is declaring the Sentencing guidelines and the Sentencing Commission unconstitutional, but it agrees with Judge Heaney in *U.S.A. v. Jesus Estrada*, 680 F.Supp. 1312 (D.Minn.1988), that the following provisions of the Sentencing Reform Act are severable and should therefore remain in effect:

(a) the detailed set of principles or sentencing standards which narrow the judge's discretion in imposing sentences;

(b) the requirement that judges state their reasons for imposing particular sentences, thus opening up the sentencing process to the public.

However, the Court does not agree that the appellate review of sentences can properly be severed and preserved since the right of appeal and the scope of appeal are so intimately tied to the Guidelines themselves. Nor does the Court agree that "real time" sentencing can be severed because, without the provisions for supervised release, prisoners would go straight from imprisonment to absolute freedom contrary to congressional intent. So we go back to the pre November 1, 1987, situation with the parole arrangements intact.

Finally the Court recognizes that it ultimately may be reversed and the Guidelines and the Sentencing Commission held constitutional. It has chosen therefore to follow a "two-track" approach. It will, at the time of sentencing, state and explain what its sentence would be assuming the Guidelines are upheld. And it will also state and explain what its sentence would be if the Guidelines are struck down as unconstitutional. Of course, the sentence which will be entered on the Judgment and Commitment form will be the latter only, because that will be the only lawful sentence under the opinion of the Court. However, if the Court is reversed and the Guidelines upheld, a new Judgment and Commitment will have to be entered, but this may be done without any further sentencing hearing. This approach will, it is hoped, effect some efficiency in the light of the uncertainties involved.

The undersigned has been authorized by the other Judges of the Eastern District of Arkansas, with the exception of Judge Stephen Reasoner, to state that they agree that the Guidelines and Commission are unconstitutional, although they may not individually agree with the undersigned as to all of the different grounds set forth in the following opinion. They also agree that certain provisions, as set forth above, are severable and will therefore remain in full force and effect. Finally, they agree to follow the two-track sentencing approach described above until questions concerning the constitutionality of the guidelines are finally resolved. Judge Reasoner is not convinced that the Guidelines are unconstitutional and has no present opinion on the severability issue. He has agreed to follow the "two track" sentencing approach.

The opinion below is separated and captioned more to provide emphasis than to suggest that any of the individual sections are unrelated and independent of the others. In truth, there is much overlap, intermeshing and interplay among the various sections.

## DELEGATION

The Court holds that Congress has unconstitutionally delegated its legislative authority to the United States Sentencing Commission.[1] The Constitution provides that, "All legislative powers herein granted

---

1. At least one commentator has reached the same conclusion. *See* L. Liman, *The Constitu-* *tional Infirmities of the United States Sentencing Commission*, 96 Yale L.J. 1363, 1369–76 (1987).

shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives." U.S. Const. Art. I, § 1. Further, the Congress is empowered "To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." U.S. Const. Art. I, § 8, cl. 18. "The Congress manifestly is not permitted to abdicate, or to transfer to others, the essential legislative functions with which it is thus vested." *Panama Refining Co. v. Ryan,* 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935) [2].

One important function of the non-delegation doctrine is to ensure that important choices of social policy are made by Congress, the branch of our Government most responsive to the popular will. *Indust. Union Dept. v. Petroleum Inst.,* 448 U.S. 607, 100 S.Ct. 2844, 2886, 65 L.Ed.2d 1010 (1980) (Rehnquist, J., concurring). The relationship between the popular will and the power to delegate has been articulated by John Locke:

> The power of the legislative, being derived from the people by a positive voluntary grant and institution, can be no other than what that positive grant conveyed, which being only to make laws, and not make legislators, the legislature can have no power to transfer their authority of making laws and place it in other hands.

*Id.* at 2879, (quoting J. Locke, Second Treatise of Civil Government in the Tradition of Freedom, at 244, M. Mayer, Ed. (1957)).

Of course, the foregoing discussion does not mean that Congress may never delegate any of its varied tasks to administrative agencies. First, Congress may authorize fact finding by an administrative agency. *Panama Refining,* 293 U.S. at 426, 55 S.Ct. at 251. Second, the Constitution does not deprive Congress of "necessary resources of flexibility and practicality, which will enable it to perform its function in laying down policies and establishing standards, while leaving to selected instrumentalities the making of subordinate rules within prescribed limits." *Id.* at 421, 55 S.Ct. at 248. While mindful of the complexities faced by a modern Congress, this Court is convinced that the Congress, by the creation of the Sentencing Commission and assignment of its duties, did more than simply assign fact finding tasks or subordinate rule making responsibilities to yet one more administrative agency. Rather, Congress delegated its authority in a core legislative field,[3] an area affecting the most fundamental of Constitutional rights. *Whalen v. United States,* 445 U.S. 684, 689, 100 S.Ct. 1432, 1436, 63 L.Ed.2d 715 (1980) (within our Federal Constitutional framework the legislative power, including the power to define criminal offenses and to prescribe the punishments to be imposed upon those found guilty of them resides wholly with the Congress); *United States v. Wiltberger,* 18 U.S. (5 Wheat) 35, 44, 5 L.Ed. 37 (1820) (It is the legislature which is to define crime and ordain punishment).

■ Delegated powers that, as in this case, affect liberty interests must be construed narrowly. *Kent v. Dulles,* 357 U.S. 116, 129, 78 S.Ct. 1113, 1120, 2 L.Ed.2d

---

**2.** The Court notes at the outset that the chief Supreme Court authorities in the delegation area, *Panama Refining* and *A.L.A. Schechter Poultry Corp. v. United States,* 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935), have been called into question. This criticism arises from the fact that those cases struck down "New Deal" legislation, relying upon discredited views of substantive due process and of the Commerce Clause. The association of the non-delegation doctrine with these discredited views does not relieve this court from its obligation to make a careful assessment of the delegation at issue here. *Indust. Union Dept. v. Am. Petroleum Inst.,* 448 U.S. 607, 100 S.Ct. 2844, 2886, 65 L.Ed.2d 1010 (1980) (Rehnquist, J., concurring)

("We ought not to shy away from our judicial duty to invalidate unconstitutional delegations of legislative authority solely out of concern that we should thereby reinvigorate discredited constitutional doctrines of the pre-New Deal era.").

**3.** *See Immigration and Naturalization Serv. v. Chada,* 462 U.S. 919, 103 S.Ct. 2764, 2784, 77 L.Ed.2d 317 (1983) (Action by the House which had the purpose and effect of altering legal rights, duties, and relations of persons outside of the Legislative Branch was legislative in nature).

1204 (1958). This is because "the numerous deficiencies connected with vague legislative directives whether to a legislative committee, ...; to an executive officer, ...; to a judge and jury, ...; or to private persons, ...; are far more serious when liberty and the exercise of fundamental rights are at stake." *United States v. Robel*, 389 U.S. 258, 88 S.Ct. 419, 430, 19 L.Ed.2d 508 (1967) (Brennan, J., concurring). Indeed, the Court has implied that core "important subjects" exist which must be entirely regulated by Congress, precluding any permissible delegation. *United States v. Grimaud*, 220 U.S. 506, 517, 31 S.Ct. 480, 483, 55 L.Ed. 563 (1911); *See J.W. Hampton, Jr. v. United States*, 276 U.S. 394, 408, 48 S.Ct. 348, 351, 72 L.Ed. 624 (1928) (The Congress may not delegate its purely legislative power.). The Court holds that the Sentencing Reform Act delegates both the power to establish penalties for violations of Federal law and the power to define criminal conduct. Both of these areas lie within the limited sphere where Congress cannot constitutionally delegate its authority.

Although congress may delegate some powers connected with the penal process, it may not delegate "so crucial a legislative function as the redrafting of federal criminal penalties." *See U.S. Parole Comm'n v. Geraghty*, 719 F.2d 1199, 1212 (3rd Cir. 1983), *cert. denied*, 465 U.S. 1103, 104 S.Ct. 1602, 80 L.Ed.2d 133 (1984) (upholding the creation of the United States Parole Commission). In *Geraghty*, the court held congressional delegation of authority to determine actual release dates to be constitutional, because the statute in question did not permit the Parole Commission to redraft federal criminal penalties. Rather, it limited the Judicial sentencing function to the selection of a sentence from a range established by Congress and allowed an agency to determine the release date in light of the judicially imposed sentence. *Id.* at 1212. Thus, the actual power to fix sentences was delegated to trial courts. The Parole Commission could only act within the boundaries established both by Congress and sentencing judges.

Traditionally, the setting of maximum possible sentences has been a part of the legislative process by which crimes are defined. Similarly, the fixing of mandatory minimum penalties has been undertaken by Congress in response to its perception of the needs of public safety and order. The Sentencing Reform Act is distinguishable from the statutes in which Congress has not specifically articulated a maximum sentence. For example, in *United States v. Jones*, 540 F.d 465 (10th Cir.1976), *cert. denied*, 429 U.S. 1101, 97 S.Ct. 1125, 51 L.Ed.2d 551 (1977), the court rejected a non-delegation challenge to the special parole term provisions of the Comprehensive Drug Abuse Prevention and Control Act of 1970. That statute provided for mandatory special parole terms following imprisonment for certain drug offenses. It provided statutory minimum terms, but it did not provide statutory maximum terms. The court held that the statute was reasonably construed as authorizing maximum special parole terms of life. *Id.* at 466 (citing *United States v. Rich*, 518 F.2d 980, 987 (8th Cir.1975)), *cert. denied*, 427 U.S. 907, 96 S.Ct. 3193, 49 L.Ed.2d 1200 (1976). Therefore Congress had implicitly set a maximum. Certainly, Congress could not have meant, in establishing a Sentencing Commission and enacting the Sentencing Reform Act, to authorize possible life sentences for every federal offense. Likewise, it could not have intended that its statutory maximum penalties always be imposed. In sum, this Court concludes that Congress has delegated the function of establishing meaningful maximum and minimum terms.

Furthermore, in *Jones*, Congress left the determination of special parole terms to the discretion of sentencing judges, a scheme described by the court as "not uncommon." *Id.* at 468. By contrast, the establishment of a body like the Commission to rewrite federal criminal penalties is unprecedented. The significance of delegating sentencing authority to judges, as opposed to an executive agency, will be elaborated in the discussion of due process below. "Whatever views may be entertained regarding severity of punishment ... these are peculiarly

matters of legislative policy." *Gore v. United States,* 357 U.S. 386, 78 S.Ct. 1280, 2 L.Ed.2d 1405 (1958). The delegation in the Sentencing Reform Act violates Article I.

Further, the Court holds that the Sentencing Reform Act impermissibly delegates to the Commission the function of defining criminal conduct. Like the task of setting penalties, the definition of crime falls within the core legislative domain and may not be delegated to others. *See Whalen* 445 U.S. at 689, 100 S.Ct. at 1436; *Wiltberger* 18 U.S. (5 Wheat.) at 44.

It is important to spell out how the Commission has, in effect, created new crimes. Of course, the Commission does not use the term "crimes." Rather it uses a variety of terms. We are here dealing with what is sometimes referred to as "uncharged conduct," "incidental conduct," and "post conviction conduct." The guidelines frequently refer to such crimes euphemistically and variously as "sentencing factors," "real offense elements," "specific offense characteristics," "particular real facts," "adjustments," "disputed factors" and "enhancements."

Let us start with the Commission's comments on the problem in "Part A, Introduction", in the Guidelines. It discusses "Real Offense vs. Charge Offense Sentencing" and describes how the Commission moved back and forth on this issue. It then states that the present guidelines have moved closer to a "charge offense" system, but goes on as follows:

> The system is not, however, pure; it has a number of real elements. For one thing, the hundreds of overlapping and duplicative statutory provisions that

make up the federal criminal law have forced the Commission to write guidelines that are descriptive of generic conduct rather than tracking purely statutory language. For another, the guidelines, both through specific offense characteristics and adjustments, take account of a number of important, commonly occurring real offense elements such as role in the offense, the presence of a gun, or the amount of money actually taken.

\*　　\*　　\*　　\*　　\*　　\*

> The Commission recognizes its system will not completely cure the problems of a real offense system. It may still be necessary, for example, for a court to determine some particular real facts that will make a difference to the sentence. Yet, the Commission believes that the instances of controversial facts will be far fewer; indeed, there will be few enough so that the court system will be able to devise fair procedures for their determination.

Note the language stating that under the guidelines system it may be necessary for the court "to determine some real facts that make a difference to the sentence." It is submitted that the term "real facts," which can and will result in imprisonment, is just an euphemism for what we are truly dealing with, to wit *crimes.*

For a specific illustration, let us examine the significance of "Specific Offense Characteristics" which usually accompany the "offense conduct" guideline. For bank robbery we have already identified Guideline § 2B3.1 which we now quote in its entirety as follows:

§ 2B3.1. Robbery
    (a) Base Offense Level: 18
    (b) Specific Offense Characteristics
        (1) If the value of the property taken or destroyed exceeded $2,500, increase the offense level as follows:

| Loss | Increase in Level |
|------|-------------------|
| (A) $2,500 or less | no increase |
| (B) $2,501–$10,000 | add 1 |
| (C) $10,001–$50,000 | add 2 |
| (D) $50,001–$250,000 | add 3 |
| (E) $250,001–$1,000,000 | add 4 |
| (F) $1,000,001–$5,000,000 | add 5 |

| Loss | Increase in Level |
|------|-------------------|
| (G) More than $5,000,000 | add 6 |

Treat the loss for a financial institution or post office as at least $5,000.

(2)     (A) If a firearm was discharged increase by 5 levels; (B) if a firearm or a dangerous weapon was otherwise used, increase by 4 levels; (C) if a firearm or other dangerous weapon was brandished, displayed or possessed, increase by 3 levels.

(3)     If any victim sustained bodily injury, increase the offense level according to the seriousness of the injury:

| Degree of Bodily Injury | Increase in Level |
|-------------------------|-------------------|
| (A) Bodily Injury | add 2 |
| (B) Serious Bodily Injury | add 4 |
| (C) Permanent or Life–Threatening Bodily Injury | add 6 |

Provided, however, that the cumulative adjustments from (2) and (3) shall not exceed 9 levels.

(4)     (A) If any person was abducted to facilitate commission of the offense or to facilitate escape, increase by 4 levels; or (B) if any person was physically restrained to facilitate commission of the offense or to facilitate escape, increase by 2 levels.

(5)     If obtaining a firearm, destructive device, or controlled substance was the object of the offense, increase by 1 level.

---

Now let us assume that a person is indicted for robbing a bank of an amount in excess of $10,000 while putting in jeopardy the life of a teller by the use of a dangerous weapon. Let us further assume that he is tried before a jury and convicted of the lesser included offense of bank robbery *without* the use of a dangerous weapon.

Let us assume that the prosecution's sentencing statement alleges that the defendant robbed the bank of the sum of $255,-000; that the defendant not only used, but discharged, a pistol, firing some shots into the air as he entered the bank; that when the robber pointed his gun at her, a terrified bank teller turned quickly, tripped and fell down the stairs breaking her hip and that this required an emergency operation. The defendant denies each of these allegations. What is the consequence if the government prevails on each of its factual contentions concerning "sentencing factors"? Answer: The base level will increase from 18 to 31 (assuming that breaking a hip is at least a "serious bodily injury"). Assuming no criminal history, this person, upon the basis of the facts established by the jury's verdict, would have an offense level of 18 and face a sentence of between 27 and 33 months. Upon the basis of the findings of the various "specific offense characteristics," his offense level rises to 31 which subjects him to a penalty of 108–135 months.

Putting aside the fact that the sentence is being quadrupled on the basis of uncharged conduct (no grand jury) found by a single district court (no petit jury) applying some standard less than that of "beyond a reasonable doubt," without the necessity of the formalities of any trial, with the defendant not necessarily having the right of confrontation, and without the necessity of applying even civil trial evidentiary standards, can it not be said without any doubt that the Sentencing Commission in defining "specific offense characteristics" is simply defining new *crimes* to which it then attaches specific penalties? If a person can be imprisoned and deprived of his liberty on the basis of such conduct for specific increments of time surely it must be because such conduct is criminal. But the Sentencing Commission would counter: "What's new? Haven't judges always done this in sentencing"? The answer is an emphatic, "No."

Of course judges take into consideration a myriad of facts and circumstances which are not charged in the indictment or information if those facts and circumstances are relevant to the sentence. Traditionally the judge examines the prior criminal record of

the accused; his level of education and intelligence; his family and employment record; his medical history and, particularly, the presence or absence of drug or alcohol problems; whether a weapon was used in the commission of a crime; the impact upon the victim or victims; and so on virtually without limit (because no two cases are exactly alike). But what happens if such facts or circumstances are placed in issue by the defendant's denial?

It is believed that the usual practice is as follows. The defendant and his attorney are required to read the presentence report carefully. The first question asked at sentencing is: "Have you and your attorney carefully read and examined the presentence report?" After receiving an affirmative response the court then asks, "Are there *any* factual errors or mistakes in the report, regardless of how trivial or insignificant they may appear?" At this point each alleged error is noted and discussed. If a factor important to sentencing is not admitted, *it simply is omitted from consideration.* The Sentencing Guidelines do not seem to acknowledge this as typical standard current practice. In its commentary to § 6A1.3 it states that, "in current practice, factors relevant to sentencing are often determined in an informal fashion". Yes, "informal" up to the point that the defendant denies the truth of a certain fact. There is no reason for courts not to consider *admitted facts* which are relevant to sentencing even though not charged. But when a fact which might result in an increased penalty is denied, it is submitted that under current practice judges ignore that fact and do not penalize the defendant therefor. Regardless, it is clear that under current practice there is nothing that requires a judge *to add a specific penalty on the basis of a finding of any particular uncharged fact.* This will not be so under

the guidelines. The Guidelines System creates an entirely new system. The Commission acknowledges this when it states in its Commentary:

> The informality is to some extent explained by the fact that particular offense and offender characteristics rarely have a highly specific or required sentencing consequence. This situation will no longer exist under sentencing guidelines. The court's resolution of disputed sentencing factors will usually have a measurable effect on the applicable punishment.

Yes, under the new Guidelines system, the court's resolution of disputed sentencing factors will have "a measurable effect" on punishment as is demonstrated in the example above. This is "what is new" beyond any doubt. Even if some judges under the old system would take into consideration such uncharged and denied conduct—and this is doubted—still the consequence thereof, if any, in the overall chemistry of sentencing would ordinarily be unascertainable.

It should also be noted that the sentence under the Guidelines may be increased not only on the basis of uncharged conduct associated with the charged crime but also on the basis of uncharged post-conviction conduct, e.g., perjury, attempts to escape, and other obstructions of justice.

Thus, through provisions of this kind the Guidelines define criminal conduct not previously defined by Congress [4]. The Commissions actions do not fall within the category of subordinate rule making described in *Panama Refining.* Rather, they are in essence, new substantive laws which the Commission has adopted. The Court holds that the power to define criminal conduct was impermissibly delegated.

**4.** Indeed, in some instances, the Guidelines delegate the authority to define federal crimes to other authorities. For example, in the determination of whether an individual is a career offender, the Guidelines instruct federal courts, in effect, to rely upon definitions of offenses under state law. *See* Fed. Sentencing Guideline 4B1.2. Although such a provision appears reasonable, in light of the fact that state legislatures have already defined terms such as felonies and

misdemeanors, the Commission's reference to state law in defining career offenders can result in a very harsh penalty. If Congress intended such a result, it should have clearly articulated that fact. Moreover, if the Commission itself intended this result, it was also obligated to articulate standards rather than relying on a sub-delegation to State legislatures. To see how this sub-delegation affects this case, see discussion under, "Due Process" section, below.

The Sentencing Reform Act is distinguishable from other instances in which Congress arguably delegated the authority to define federal crimes. In several cases, for example, courts have upheld the delegation to various executive agencies to schedule drugs. *See, e.g., United States v. Gordon*, 580 F.2d 827, 839 (5th Cir.1978), *cert. denied*, 439 U.S. 1051, 99 S.Ct. 731, 58 L.Ed.2d 711 (1978); *United States v. Pastor*, 557 F.2d 930, 941 (2nd Cir.1977). Similarly, a delegation by Congress of the power to define explosives has been upheld. *United States v. Womack*, 654 F.2d 1034 (1981), *cert. denied*, 454 U.S. 1156, 102 S.Ct. 1029, 71 L.Ed.2d 314 (1982). These situations are examples of highly technical, rapidly changing fields in which Congress may delegate the power to "fill up the details". *Grimaud*, 220 U.S. at 517, 31 S.Ct. at 483. Although the statutes arguably delegated the authority to define criminal conduct, they did so at a far different level than do the Guidelines. In the former cases, Congress had expressly defined criteria for scheduling drugs and for regulating explosives. All that remained was the fact finding and addition of new substances which conformed with the Congressional definitions. In the latter case, the Commission has established both the criteria and the details.

■ Even assuming that delegation is permissible in the fields of setting criminal penalties and defining crime, Congress failed to provide adequate standards to guide the Sentencing Commission. In order to delegate its authority, particularly in an area affecting fundamental rights, Congress must declare a specific policy with respect to the issue involved and create standards to govern the actions of the delegatee. *See Panama Refining*, 293 U.S. at 415, 55 S.Ct. at 246. In other words Congress must clearly delineate the general policy, the public agency which is to apply it, and the boundaries of this delegated authority. *Am. Power and Light Co. v.*

*Securities and Exchange Comm'n*, 329 U.S. 90, 105, 67 S.Ct. 133, 142, 91 L.Ed. 103 (1946).

The existence of clearly delineated standards prompted the courts to uphold legislation delegating the authority to reschedule drugs and to add new drugs to existing schedules. One court discussed the elaborate scheme involved in the scheduling process. In order to add a drug to the control schedules, the Attorney General was required first to make a finding that the drug had a potential for abuse. Second, the Attorney General was required to make specific findings to determine in which schedule the drug belonged. Third, he was required to request, from the Secretary of Health Education and Welfare, a report on the drug and a scheduling recommendation. He was required to defer to some of the Secretary's findings and recommendations. *Pastor*, 557 F.2d at 939. The *Pastor* court held that these procedures coupled with the availability of judicial review rendered the delegation constitutional. *Id.* at 941.

The procedures described above differ markedly from the delegation struck down in *Panama Refining*. In that case, the Court reviewed section 9(c) of the National Industrial Recovery Act, ("NIRA"). That section authorized the President to prohibit the transportation, in interstate or foreign commerce, of "hot oil"—petroleum or petroleum products produced or withdrawn from storage in excess of the amounts permitted by state law. If a Presidential prohibition were issued, violation was made a misdemeanor.

The Court stated: section 9(c) "gives the President an unlimited authority to determine the policy and lay down the prohibition, or not to lay it down, as he may see fit." *Panama Refining*, 293 U.S. at 415, 55 S.Ct. at 246. Moreover, an introductory statement of purpose at the beginning of NIRA could not cure the improper delegation, because it did not set forth policies with sufficient clarity[5]. The Court stated:

---

5. Section 1 of the NIRA stated:
   Section 1. A. national emergency productive of widespread unemployment and disorganization of industry, which burdens interstate

and foreign commerce, affects the public welfare, and undermines the standards of living of the American people, is hereby declared to exist. It is hereby declared to be the policy of

To hold that [the President] is free to select as he chooses from the many and various objects generally described in the first section, and then to act without making any finding with respect to any object that he does select, and the circumstances properly related to the object, would be in effect to make the conditions inoperative and to invest him with an uncontrolled legislative power.

*Id.* 293 U.S. at 431–432, 55 S.Ct. at 253. The creation of the Commission and the promulgation of the Sentencing Guidelines resemble the standardless delegation rejected in *Panama Refining.*

In establishing the Commission, Congress set forth the purposes and duties of the Commission. First, Congress expressed its intent that the Guidelines should be mandatory. In other words, federal courts would be bound to follow them.[6] 18 U.S.C.A. § 3553(b) (West Supp.1987). Congress further stated:

(b) The purposes of the United States Sentencing Commission are to—

(1) establish sentencing policies and practices for the Federal criminal justice system that—

(A) assure the meeting of the purposes of sentencing as set forth in section 3553(a)(2) of title 18, United States Code;

(B) provide certainty and fairness in meeting the purpose of sentencing, avoiding unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct while maintaining sufficient flexibility to permit individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices; and

(C) reflect, to the extent practicable, advancement in knowledge of human behavior as it relates to the criminal justice process; and

(2) develop means of measuring the degree to which the sentencing, penal, and correctional practices are effective in meeting the purpose of sentencing as set forth in section 3553(a)(2) of title 18, United States Code.

28 U.S.C.A. § 991(b) (West Supp.1987). 18 U.S.C.A. § 3553(a)(2) (West 1985) defines the purposes of sentencing as, "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." The Court concludes that these general statements only serve to document widely accepted penalogical goals, some at odds with others. These general provisions fail to channel the discretion of the Commission.

---

Congress to remove obstructions to the free flow of interstate and foreign commerce which tend to diminish the amount thereof; and to provide for the general welfare by promoting the organization of industry for the purpose of cooperative action of labor and management under adequate governmental sanctions and supervision, to eliminate unfair competitive practices, to promote the fullest possible utilization of the present productive capacity of industries, to avoid undue restriction of production (except as may be temporarily required), to increase the consumption of industrial and agricultural products by increasing purchasing power, to reduce and relieve unemployment, to improve standards of labor, and to rehabilitate industry and to conserve natural resources.
293 U.S. at 416–417 n. 6, 55 S.Ct. at 247 n. 6.

**6.** Application of guidelines in imposing a sentence.—The court shall impose a sentence of the kind, and within the range, referred to in subsection (a)(4) unless the court finds that an aggravating or mitigating circumstance exists that was not adequately taken into consideration by the Sentencing Commission in formulating the guidelines and that should result in a sentence different from that described. In the absence of an applicable sentencing guideline, the court shall impose an appropriate sentence, having due regard for the relationship of the sentence imposed to sentences prescribed by guidelines applicable to similar offenses and offenders, the applicable policy statements of the Sentencing Commission, and the purposes of sentencing set forth in subsection (a)(2). 18 U.S.C.A. § 3553(b) (West Supp., 1987).

Thus, the Court must determine whether other provisions in the Sentencing Reform Act provide adequate guidance to the Commission. The statute instructs the Commission to promulgate guidelines for use of a sentencing court in determining the sentence to be imposed in a criminal case. 28 U.S.C.A. § 994(a) (West Supp.1987). Congress expressed the view that "in many cases, current sentences do not accurately reflect the seriousness of the offense." Therefore, as a starting point the Commission was directed to ascertain the average sentence imposed in various categories of cases prior to the Guidelines. 28 U.S.C.A. § 994(m) (West Supp.1987). This section however, does not obligate the Commission to use these findings in any way; thus, it does little to solve the delegation problems.

An additional provision in the statute describes the permissible size of sentencing ranges if terms of imprisonment are imposed. The maximum range may not exceed the minimum by more than the greater of twenty-five percent or six months, except that, if the minimum term of the range is thirty years or more, the maximum may be life imprisonment. 28 U.S.C.A. § 994(b)(2) (West Supp.1987). At most, this section demonstrates Congress' intent to decrease, but not eliminate completely, the discretion of sentencing judges. Had it wished, Congress could have directed the Commission to set mandatory sentences rather than sentencing ranges, precluding any Judicial discretion. Nevertheless, Congress delegated to the Commission

the difficult choices of re-establishing sentencing policy. The fact that Congress provided for sentencing ranges within the guidelines and suggested the sizes of those ranges, does not alter the unconstitutionality of the policy delegation.

Congress also expressed its view that the guidelines must be "neutral as to the race, sex, national origin, creed, and socioeconomic status of offenders." 28 U.S.C.A. § 994(d) (West Supp.1987). A related provision discusses the importance of providing certainty in sentencing and reducing unwarranted disparity. 28 U.S.C.A. § 994(f) (West Supp.1987). These provisions state basic policy choices by Congress, but these choices are in the nature of general principles or platitudes. They are too general to give the Commission clear guidance as to the standards it should apply in drafting the Guidelines.

At a superficial level, the statute appears to channel the Commission's discretion. For example, it directs the Commission to consider the relevance of certain factors when establishing categories of offenses [7] and defendants [8]. 28 U.S.C.A. § 994(c) and (d) (West Supp.1987). The Commission, however, not Congress, has the final determination as to whether these factors are relevant. *Id.* Congress also authorized penalties at or near the maximum for certain classes of offender,[9] and it instructed the Commission to sentence certain offenders to "substantial" terms of imprisonment.[10] 28 U.S.C.A. § 994(h), (i) (West

---

**7.** Section 994(c) directs the Commission to consider the relevance of the grade of the offense, aggravating or mitigating circumstances, the nature and degree of the harm caused by the offense, the community view of the gravity of the offense, the public concern generated by the offense, the deterrent effect a particular sentence may have on the commission of the offense by others, and the current incidence of the offense in the community and in the Nation as a whole.

**8.** Section 994(d) instructs the Commission to consider age, education, vocational skills, mental and emotional condition (if plainly relevant), physical condition, previous employment record, family ties and responsibilities, community ties, role in the offense, criminal history, and degree of dependence upon criminal activi-

ty for a livelihood. However, Congress at least made it clear that consideration of education, vocational skills, employment record, family ties and responsibilities, and community ties of the defendant is generally inappropriate in recommending a term of imprisonment. 28 U.S.C.A. § 994(e) (West Supp., 1987). This provision affords little guidance to the Commission, because it only applies to prison terms, and the commission is still granted the ultimate decision as to the importance of these factors in the Guidelines as a whole. 28 U.S.C.A. § 994(d).

**9.** This section concerns offenders who have been convicted of either a crime of violence or certain drug offenses.

**10.** This section concerns, offenders who "[have] a history of two or more prior Federal, State, or

Supp.1987). Similarly, Congress instructed that the Guidelines reflect the general appropriateness of sentencing first offenders to punishments other than incarceration, except where they have been convicted of "serious offenses." 28 U.S.C.A. § 994(j) (West Supp.1987). Congress, through the use of abstract terms, has delegated its authority while appearing to regulate the Commission. For example, terms such as "substantial terms of imprisonment" and "serious offenses" are not defined. Rather, the Commission has been provided with vague directives and virtually total discretion to define terms as it wishes and rewrite Federal penal law.

In addition, Congress stated that the Guidelines were to be formulated "to minimize the likelihood that the Federal prison population will exceed the capacity of the Federal prisons, as determined by the Commission." 28 U.S.C.A. § 994(g) (West Supp.1987). On the surface, it would appear that Congress had assigned a fact finding task to the Commission, a permissible delegation. However, only the Commission is given the duty of interpreting given facts to arrive at a legislative mandate. Once again, Congress has delegated significant legislative authority to this unelected body.

To sum up, ours is a representative democracy. The people choose their legislative representative and vest in them the powers to make the laws which will govern us. As stated by John Locke the people do not vest their elected legislators with the power to "make [others] legislators; the legislature has no power to transfer their authority of making laws and place it in other hands." At least this is true in core areas, such as this, where the most fundamental of our constitutional rights are implicated. What is more important than our personal freedom and liberty? Who shall determine the conduct that will warrant the loss of that freedom? And who shall determine the penalties that may be imposed for such acts?

Congress in its understandable frustration has attempted to take itself out of the crime and punishment business. But as unpleasant as the job may be, it is only the Congress—not the President, not some administrative agency (whether called "judicial" or "executive"), not the courts—that, under our Constitution may determine what conduct shall constitute a crime and what the penalty shall be. Therefore, the delegation here violates the Constitution.

In a different context, Chief Justice Rehnquist made a statement which this Court finds applicable to the present situation: "It is difficult to imagine a more obvious example of Congress simply avoiding a choice which was both fundamental for purposes of the statute and yet politically so divisive that the necessary decision or compromise was difficult if not impossible, to hammer out in the legislative forge." *Indust. Union Dept. v. Am. Petroleum Inst.*, 448 U.S. 607, 100 S.Ct. 2844, 65 L.Ed.2d 1010 (1980) (Rehnquist J., concurring). The Court holds that Congress, rather than an unelected administrative commission, must decide these crucial issues of Federal law.

PRESENTMENT

Promulgation of Sentencing Guidelines by the Commission also violates principles of bicameralism and presentment. The Constitution states that the Congress of the United States shall consist of both a House of Representatives and a Senate. *United States Const.*, Art. 1 § 1. In addition, the Constitution requires that every bill which has passed both houses shall be

---

local felony convictions for offenses committed on different occasions; ... committed the offense as part of a pattern of criminal conduct from which [they] derived a substantial portion of [their] income; ... committed the offense in furtherance of a conspiracy with three or more persons engaging in a pattern of racketeering activity in which the defendant participated in a managerial or supervisory capacity; ... committed a crime of violence that constitutes a felony while on release pending trial, sentence, or appeal from a Federal, State, or local felony for which [they were] ultimately convicted; or committed certain drug related felonies." 28 U.S.C.A. § 994(i). The Act also provides that the Guidelines should reflect the general appropriateness of a term of incarceration for "a person convicted of a crime of violence that results in serious bodily injury." 28 U.S.C.A. § 994(j).

presented to the President. *See United States Const.* Art. I § 7, cl. 2. The legislative steps outlined in Article I are not empty formalities; they were designed to assure that both Houses of Congress and the President participate in the exercise of lawmaking authority. *Immigration and Naturalization Serv. v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 2788 n. 23, 77 L.Ed.2d 317 (1983).

▆ Even assuming that the delegation of Congress' authority to the Sentencing Commission is valid, if the promulgation of the Guidelines is deemed a "legislative act", then before the Guidelines can become law they must be passed by both Houses of Congress and presented to the President as specified in Article I. *United States v. Johnson,* 682 F.Supp. 1033 (W.D. Mo.1988) (en banc) (Wright, J. dissenting). The fact that Congress provided that the Guidelines were to become law if Congress failed to disapprove or to modify them does not remedy the Article I violation. *Id. See Chadha,* 103 S.Ct. at 2788 (To allow Congress to evade the strictures of the Constitution and in effect enact Executive proposals into law by mere silence cannot be squared with Art. I).

As this Court discussed above, the work of the Sentencing Commission was legislative in character. First, the Commission arguably created new substantive criminal offenses, a function traditionally performed by Congress. Second, the Commission established new penalty ranges for existing Federal offenses and fixed penalties for the new crimes it created, also a task traditionally performed by Congress. Third, as pointed out by District Judge Wright in a recent opinion discussing the Guidelines, "[t]he primary purpose of the Guidelines is to curtail the previously broad sentencing discretion of Article III Judges." *Johnson,*

at 1037 (Wright, J. dissenting). Congress has delegated the authority to regulate Federal Judges to a Presidentially appointed Commission. *Id.* "Surely, any Congressional limitations on the sentencing discretion of federal judges, under a previous grant of Congressional authority, can only be accomplished via a legislative act, requiring passage by both Houses and presentment to the President." [11] *Id.* Because the Guidelines are mandatory and bind the Federal Judiciary, their adoption constitutes a legislative act which must comply with Article I. Because they have not been enacted by both Houses of Congress and presented to the President, they have not become law.

PLACEMENT OF THE COMMISSION

▆ The Court holds that placement of the Sentencing Commission within the judicial branch violates the Constitution. Congress created the Commission as "an independent commission in the judicial branch of the United States". 28 U.S.C.A. § 991(a) (West Supp.1987). The Commission, however, does not exercise Article III powers. It does not adjudicate cases or controversies. *See United States v. Smith,* 686 F.Supp. 847, 862 (D.Colo. 1988). The only function performed by the Commission which is arguably judicial is found at sec. 994(s). That section provides, "The Commission shall give due consideration to any petition filed by a defendant requesting modifications of the guidelines utilized in the sentencing of such defendant, on the basis of changed circumstances unrelated to the defendant, including changes in—(1) the community view of the gravity of the offense; (2) the public concern generated by the offense; and (3) the deterrent effect particular sentences may have on the com-

11. In *Chadha* for example, an alien challenged the provisions for legislative veto of the Attorney General's decision to suspend his deportation. The Court stated, "Disagreement with the Attorney General's decision on *Chadha's* deportation—that is, Congress' decision to deport *Chadha*—no less than Congress' original choice to delegate to the Attorney General the authority to make that decision, involves determinations of policy that Congress can implement in only

one way; bicameral passage followed by presentment to the President. Congress must abide by its delegation of authority until that delegation is legislatively altered or revoked." 103 S.Ct. at 2788. Likewise, in this case Congress had previously granted discretion in sentencing to Federal Judges. That grant was a legislative act. Any decision to revoke that broad grant is also a legislative act, and must be implemented in accordance with Article I.

mission of the offense by others." 28 U.S. C.A. § 994(s) (West Supp.1987).

Even this arguably judicial function when performed by the Commission violates Article III. In *Northern Pipeline v. Marathon Pipe Line,* 458 U.S. 50, 59, 102 S.Ct. 2858, 2865, 73 L.Ed.2d 598 (1982), the Court stated, "The judicial power of the United States must be exercised by courts having the attributes prescribed in Art. III." Those attributes are life tenure and fixed and irreducible compensation for their services. *Id.* The commissioners who are not judges clearly enjoy neither Art. III safeguard. They are removable by the President and thus they are not assured of compensation. This fact alone precludes valid placement of the Commission within the judiciary.

Arguably, the commissioner judges also lack Article III safeguards. First, they perform their duties as commissioners rather than as judges. *See United States v. Ferreria,* 54 U.S. (13 How.) 40, 47, 14 L.Ed. 40 (1851). Thus, the judges may be removed from their capacity as commissioners by the President. This possibility does not deprive the Judges of life tenure, but it potentially compromises their independent position so as to weaken the guarantee that life tenure was intended to establish.

Second, the Sentencing Reform Act creates the potential for a violation of Art. III's compensation clause. The Act authorizes payment of voting commissioners at the rate paid to judges on the United States Courts of Appeals. 28 U.S.C.A. § 992(c). Thus, if a district court judge is appointed to the commission, he receives a salary increase subject to the President's removal power. These factors underscore the control exercised by the Executive over the commission. Such Executive control over the judicial branch is unconstitutional.

■ Having determined that the commissions placement within the judiciary violates the constitution, the Court must de-cide whether that unconstitutional placement can be severed from the Act. The inquiry is whether the statute, minus the unconstitutional portion, "will function in a *manner* consistent with the intent of congress." *Alaska Airlines, Inc. v. Brock,* 480 U.S. 678, 107 S.Ct. 1476, 1481, 94 L.Ed.2d 661 (1987). The Court concludes that the statutory provision placing the commission within the judiciary is severable. The Commission may still perform its statutory mandate if placed in the executive branch. In fact, by promulgating the guidelines it has already accomplished a substantial portion of its responsibilities. The fact that the placement of the commission does not invalidate the statute does not mean that the difficulties associated with the creation of the commission should be disregarded. As will be discussed below, many factors which counsel against placement in the judiciary will recur in the separation of powers context.

## SEPARATION OF POWERS

■ The composition of the Sentencing Commission, particularly the inclusion of Art. III Judges on it, violates well established principles of separation of powers. The Constitution prohibits serious encroachment by members of one governmental branch into the affairs of another. *See Bowsher v. Synar,* 478 U.S. 714, 106 S.Ct. 3181, 3192, 92 L.Ed.2d 583 (1986); *Massachusetts v. Mellon,* 262 U.S. 447, 488, 43 S.Ct. 597, 601, 67 L.Ed. 1078 (1923); *see also Immigration and Naturalization Serv. v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) (The hydraulic pressure inherent within each of the separate branches to exceed the outer limits of its power, even to accomplish desirable objectives, must be resisted.).[12] To put it another way, the Separation of Powers Doctrine is violated when Article III judges are entrusted with a function properly assigned to another branch. *See In re Sealed Case,* 838 F.2d 476, 511 (D.C.Cir.

---

12. James Madison wrote, "Where the whole power of one department is exercised by the same hands which possess the whole power of another department the fundamental principles of a free constitution are violated" *The Federal-* *ist,* No. 47 pp. 325–326 (J. Cooke Ed.1961), *quoted in In re Application of President's Comm'n on Organized Crime Subpoena of Scarfo,* 783 F.2d 370, 374 (3rd Cir.1986).

1988); *See also Whalen v. United States,* 445 U.S. 684, 689, 100 S.Ct. 1432, 1436, 63 L.Ed.2d 715 (1980) (federal courts violate separation of powers when they impose punishments not authorized by Congress). The declared purpose of separating and dividing the powers of government, of course, was to "diffuse power the better to secure liberty." *Bowsher,* 106 S.Ct. at 3186 (quoting *Youngstown Sheet and Tube Co. v. Sawyer,* 343 U.S. 579, 72 S.Ct. 863, 870, 96 L.Ed. 1153 (1952)). James Madison wrote:

> "[W]ere the power of judging joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control, for *the judge* would then be *the legislator.* Were if joined to the executive power, *the judge* might behave with all the violence of *an oppressor.*"

*The Federalist,* No. 47, at 326 (J. Madison) (J. Cooke ed. 1961) (emphasis in original) (quoting Montesquieu) *quoted in In re Sealed Case,* 838 F.2d at 516.

Certainly, the Constitution does not hermetically seal the branches of government, but the extreme intrusion into legislative and or executive matters by members of the judiciary inherent in the promulgation of the Guidelines, exceeds all permissible limits. In their service on the sentencing commission, Article III judges perform a nonjudicial function. "The functions of government under our system are apportioned. To the legislative department has been committed the duty of making laws; to the executive the duty of executing them; and to the judiciary the duty of interpreting and applying them in cases properly brought before the courts." *Mellon,* 262 U.S. at 488, 43 S.Ct. at 601. Article III limits the judiciary to the decision of cases or controversies. In the criminal context, "the constitutional scheme is as simple as it is complete—Congress passes the criminal law in the first instance, the President enforces the law, and individual cases are tried before a neutral judiciary involved in neither the creation nor the execution of the law." *In re Sealed Case,* 838 F.2d at 489. While the legislative function consists of "laying down new rules to guide future action," the judicial function is "confined to definition and protection of existing rights." *Keller v. Potomac Elec. Power Co.* 261 U.S. 428, 440, 43 S.Ct. 445, 447–48, 67 L.Ed. 731 (1923). "A judicial inquiry investigates, declares and enforces liabilities as they stand on present or past facts and under laws supposed already to exist." *Prentis v. Atlantic Coast Line Co.,* 211 U.S. 210, 226, 29 S.Ct. 67, 73, 53 L.Ed. 150 (1908).

On several occasions, the Supreme Court or its Justices have noted the inappropriateness of allowing judges to perform functions outside the adjudication of cases or controversy. In *Hayburns case,* 2 U.S. (2 Dall.) 409, 1 L.Ed. 436 (1792), an act of Congress required the Circuit Courts of the United States to examine pension claims of Revolutionary war veterans and to determine the proper amount to be paid. The court's decisions were to be certified for review to the Secretary of War. The Attorney General sought a writ of mandamus to compel the Circuit Courts to fulfill their duty under the act.

Although the Supreme Court never decided the issue, the opinions of some of the Justices, serving in their capacities as circuit court judges, are instructive. The Circuit Court for the District of New York stated:

> [B]y the Constitution of the United States, the government thereof is divided into *three* distinct and independent branches, and that it is the duty of each to abstain from, and to oppose encroachments on either.... [N]either the legislative nor the executive branches, can constitutionally assign to the judicial any duties, but such as are properly judicial, and to be performed in a judicial manner.... [T]he duties assigned to the circuit, by this act, are not of that description.

*Id.* at 409 n. a (emphasis in original). Before the Court could reach the merits in *Hayburn's case,* Congress repealed the act at issue and established an alternative system for review of pension claims. That fact shows that Congress and the President agreed that the act had conferred a nonju-

dicial power. *United States v. Ferreria,* 54 U.S. (13 How.) 40, 49, 14 L.Ed. 40 (1851).

Similarly, in *Ferreria,* a treaty and enabling statute authorized judges to determine injuries suffered by Spanish soldiers in Florida, subject to review by the Secretary of the Treasury. The Court stated:

[I]t is manifest that this power to decide upon the validity of these claims, is not conferred to them as a judicial function, to be exercised in the ordinary forms as courts of justice. For there is to be no suit; no parties in the legal acceptance of the term, are to be made—no process to issue; and no one is authorized to appear on behalf of the United States, or to summon witnesses in the case.

*Id.* at 46. Rather than the judicial function of deciding cases and controversies, the authority conferred upon the judges was "nothing more than that of commissioners to adjust claims against the United States." *Id.* at 47.

In *Keller,* a statute enabled the Power Commissioner of the District of Columbia to invoke the advice of the District Supreme Court upon the elements in value to be considered in arriving at a true valuation of the property of a utility. *Keller v. Potomac Elec. Co.,* 261 U.S. 428, 439, 43 S.Ct. 445, 447, 67 L.Ed. 731 (1923). The Court held that the statute brought courts into the legislative field of fixing rates. *Id.* at 442, 43 S.Ct. at 448. It stated, "We can not escape the conclusion that Congress intended that the court shall revise the legislative discretion of the commission by considering the evidence and full record of the case and entering the order it deems the Commission ought to have made." *Id.* Congress' broad authority to regulate the District of Columbia [13] lent the statute a measure of validity, but the Supreme Court

refused to consider an appeal from a court acting in a legislative capacity such as this. *Id.* at 443, 43 S.Ct. at 448–49.

In *In re Sealed Case,* 838 F.2d 476 (D.C. Cir.1988), the court considered the constitutionality of the Ethics in Government Act. That act empowered the Attorney General to make preliminary investigations of suspected wrong doing in the government. If his investigations persuaded him that there were reasonable grounds to believe that further investigations were warranted, then he was required to refer the matter to the Independent Counsel Division of the United States Court of Appeals (the "Special Court").

The "Special Court", under the act, appointed an independent counsel to conduct further investigation. In addition to appointing the independent counsel, the "Special Court" defined the jurisdiction of the investigation and received the counsel's reports. When the "Special Court" concluded that all the independent counsel functions had been discharged, it could terminate the investigation and the office of independent counsel.

The court held that the assignment of these tasks to an Article III court was unconstitutional. It based this holding on the fact that the act involved the "Special Court" in the non-Article III task of supervising the day-to-day activities of an Executive Branch official. The courts stated "Discharging tasks other than the deciding of cases and controversies would involve the judges too intimately in the process of policy and thereby weaken confidence in the disinterestedness of their adjudicatory functions." *Id.* at 512, (quoting F. Frankfurter, *Advisory Opinions,* in 1 ENCYCLOPEDIA OF THE SOCIAL SCIENCES 475, 478 (1930)). It also noted "Where there is no law to apply [14] and where a

---

**13.** Congress' authority to regulate the District of Columbia allowed it to "clothe the courts of the District not only with the jurisdiction and powers of Federal courts in the several states but with such authority as a state may confer on her courts." *Id.* at 443, 43 S.Ct. at 448–49 (citing *Kendall v. United States ex rel. Stokes,* 37 U.S. (12 Pet.) 524, 619, 9 L.Ed. 1181 (1838)).

**14.** At first blush, this statement might seem inapplicable to the Sentencing Commission, be-

cause it acts pursuant to the Sentencing Reform Act. Nevertheless, that Statute, as discussed in the delegation portion of this opinion, provides only a broad directive and leaves the commission free to enact policy as it sees fit. Therefore, the fact that enabling legislation provides some guidance to judges performing nonjudicial functions does not remedy the Article III problems.

decision necessarily involves a paradigmatic political choice to allocate societal resources one way rather than another, a court must inevitably act 'under' compulsion and motives that have no relation to performances of our Article III functions.'" *Id.* at 514, (quoting *Vermont v. New York,* 417 U.S. 270, 277, 94 S.Ct. 2248, 2252, 41 L.Ed.2d 61 (1974)).

The above examples persuade this Court that the Sentencing Commission, and its judicial members, have acted in a non-judicial manner. In fact, the Commission's activities are more clearly legislative in character than those described above. The activities also arguably share Executive qualities as well. A majority of the Commission is composed of executive officials, and the power of appointment and removal are possessed by the President. First, the Commission is directed to "establish" sentencing policies and practices. 28 U.S.C.A. § 991(b) (West Supp.1987). Therefore, the Commission possesses far more legislative discretion than did the judges in *Keller, Ferreria,* or *Hayburn's case.* Second, in promulgating the Guidelines, the Commission was given a virtually clean slate. It was not constrained by individual claims or circumstances, as were the judges in the above cases. The Court holds that the Commission's broad authority allows its member judges, impermissibly, to encroach into the legislative domain. These judges perform functions outside the boundaries of Article III, properly performed by either the legislature or executive branch.

In addition, the control exercised by members of the executive branch over the Commission's activities render those activities outside of the judicial sphere. In *Hayburn's case,* the circuit Court for the District of New York stated:

[T]he duties assigned to the circuit, by this act are not [judicial] ... insomuch as it subjects the decisions of these courts, made pursuant to those duties, first to the consideration and suspension of the secretary at war, and then to the revision of the legislature; whereas by the constitution, neither the secretary at war, nor any other executive officer, nor even the legislature, are authorized to sit as a court of errors on the judicial acts or opinions of this court.

*Hayburn's case,* 2 U.S. (2 Dall.) at 409 n. a. Similarly, the *Ferreria,* Court stated that when the Secretary of the Treasury had final review authority of court decisions fixing claims against the United States, the courts were not making final judicial determinations. *Ferreria,* 54 U.S. (13 How.) at 46. In sum, when executive officials have final authority over the decisions of judges, the decisions fall outside of the independent judicial power contemplated by Article III.

The majority of voting members on the Commission are members of the executive branch. In addition, the Attorney General acts as a nonvoting member, adding to the dominance of the executive branch. Finally, the President has removal power over all commissioners, including the Article III judges. Therefore, in performing their duties on the Sentencing Commission, Article III judges have impermissibly acted in a non-judicial fashion.

■ The above discussion does not mean that Article III judges are strictly limited to the function of deciding cases. They may Constitutionally perform the administrative function of making rules necessary "for the effective and expeditious administration of the courts". *Chandler v. Judicial Council to 10th Cir. of U.S.,* 398 U.S. 74, 90 S.Ct. 1648, 1654, n. 7, 26 L.Ed.2d 100 (1970). Judges do not violate separation of powers principles when they participate in ancillary court management tasks. *In re Matter of Certain Complaints under Investigation,* 783 F.2d 1488, 1503 (11th Cir. 1986), *cert. denied,* 477 U.S. 904, 106 S.Ct. 3273, 91 L.Ed.2d 563 (1986). The test for permissibility is whether a rule formulated by judges "really regulates procedure,— the judicial process for enforcing rights and duties recognized by substantive law and for justly administering remedy and redress for disregard or infraction of them." *Sibbach v. Wilson & Co.,* 312 U.S. 1, 14, 61 S.Ct. 422, 427, 85 L.Ed. 479 (1941); *See Hastings v. Judicial Conference of U.S.,* 770 F.2d 1093, 1108 (D.C.Cir.1985)

(Edwards, J. concurring), *cert. denied,* 477 U.S. 904, 106 S.Ct. 3273, 91 L.Ed.2d 563 (1986) ("Congress has the power to establish (or authorize the judiciary to establish) purely *administrative,* "housekeeping" procedures—such as procedures for managing dockets and assigning cases—that authority does not necessarily extend beyond such administrative matters."). The procedures enacted by judges must have the sole purpose of promoting the effective and expeditious administration of the business of the courts. *Compare In re Matter of Certain Complaints,* 783 F.2d at 1505 (investigation by a committee of judges into the conduct of another judge with the purpose of promoting judicial efficiency constitutional) *with In re Application of President's Comm'n on Organized Crime Subpoena of Scaduto,* 763 F.2d 1191, 1197 (11th Cir.1985) [hereinafter *Scaduto* ] (service by judges on a Presidential Commission with the purpose of law enforcement unconstitutional).

Although the line between permissible judicial rule making, ancillary to court business, and impermissible judicial encroachment into other branches of government, may be hard to draw, there can be no doubt that the work of the Sentencing Commission falls on the impermissible side. The purpose of the Commission is to establish sentencing policies and practices for the Federal criminal justice system. 28 U.S.C.A. s. 991(b) (West Supp. 1987). Admittedly, some of the "practices" contemplated by the Act may qualify as the type of procedural rules which judges may enact. Nevertheless, the Commission's mandate extends well beyond procedures. *See Miller v. Florida,* —— U.S. ——, 107 S.Ct. 2446, 2453, 96 L.Ed.2d 351 (1987) (holding that a change in Florida's Sentencing Guidelines which had the effect of increasing the defendant's sentence were substantive law rather than procedural rules). First, the Commission possesses broad investigatory powers not normally associated with the judiciary. *Scaduto,* 763 F.2d at 1197, n. 7. Second, as discussed above, the Commission has, in essence, adopted legislation as to criminal penalties. The court concludes that the work of the Commission

does not fall in the area of permissible procedural rule making or Court related investigatory work in which judges may constitutionally engage.

Because the Court holds that the judges serving on the Sentencing Commission have acted in a non-judicial fashion, it must now address the question of whether such service disrupts the function of the judicial branch. *Nixon v. Adm'r of Gen. Services,* 433 U.S. 425, 97 S.Ct. 2777, 2788, 53 L.Ed. 2d 867 (1977). The Court must determine whether judicial service on the Commission disrupts the proper balance between the coordinate branches or prevents the judicial branch from accomplishing its constitutionally assigned functions. *Scaduto,* 763 F.2d at 1195. The Court concludes that the judicial service at issue here significantly interferes with the impartiality of the judiciary.

In a case with facts similar to those here, a separation of powers violation was held to exist. In *Scaduto,* the eleventh Circuit held that service by an active appellate court judge and a retired Supreme Court Justice, on the President's Commission on Organized Crime violated the Separation of Powers Doctrine. *Id.* at 1197. The Commission on Organized Crime was given the task of advising the President and Attorney General on how to improve efforts against organized crime and recommending improvements in the legislative, administrative, and judicial treatment of organized crime. Congress determined the Commissioners to be law enforcement officers.

In its discussion of possible interference with the judicial function caused by participation of judges on the Commission, the *Scaduto* court stated:

Impartiality is one of the central, constitutionally ordained, requirements of the federal judicial office, ... and this impartiality is threatened by many of the activities of the Commission. A judge who is charged with assisting and improving enforcement efforts against organized crime must adopt a pro-government perspective which is ill-suited to his obligation to be neutral in the courtroom. The kind of information he might uncov-

er through the investigatory activities of the Commission would further endanger his impartiality. If the data and testimony surveyed by the Commission were to demonstrate, for example, that the magnitude of the threat posed by organized crime was greater than had previously been suspected, that a substantial amount of organized crime activity was never prosecuted, or that law enforcement officials in many parts of the country employed methods which were poorly chosen, subject to abuse or inadequate to combat the problem, such discoveries could affect the way the judge approached those organized crime suspects and law enforcement officials in cases who appeared before him. Moreover, even if a judge could satisfy himself that he could separate his participation on the Commission from his judicial functions, it is not clear that litigants could sustain equal faith in his impartiality.

*Id.* at 1197.

The Court notes that another Circuit, ruling on the constitutionality of the Commission on Organized Crime, reached a contrary result. *See In re Application of President's Comm'n on Organized Crime Subpoena of Scarfo*, 783 F.2d 370 (3rd Cir.1986) [hereinafter, *Scarfo*]. First, the court found that the work of the Commission was in fact nonjudicial. *Id.* at 376. Further, the court held that service by one active Circuit judge and a retired Supreme Court Justice, did not impair the functioning of the Judiciary. It noted the ability of the active judge to recuse himself in matters in which his service might have created a conflict of interest. *Id.* at 381.

The *Scarfo* court, however, placed great reliance on the fact that the judges who served on the Organized Crime Commission did so voluntarily, i.e. the enabling statute and Executive Order creating that Commission did not compel appointment of judges to serve on it. *Id.* at 378. The court specifically cited the Sentencing Commission as an example of mandatory, rather than voluntary, judicial service. *Id.* at note.

This notion of a distinction between voluntary and mandatory judicial service influenced the outcome in *Scarfo*. The decision in *Ferreira* implies that judges may serve nonjudicial functions in their individual, as opposed to their judicial, capacities. *Ferreira*, 54 U.S. (13 How.) at 51; *See Scarfo* 783 F.2d at 375. Clearly, the judges who serve on the Sentencing Commission do so, at least in some manner, as judges rather than individuals. The enabling legislation mandates that Article III judges will serve on the Commission. Therefore, judicial service creates a class from which Sentencing Commissioners must be chosen. The Court concludes that the main factor relied upon by the *Scarfo* court in holding the composition of the Organized Crime Commission constitutional is lacking in this case.

Service of judges on the Commission threatens to impair the functioning of an impartial judiciary. First, as noted in *Scaduto*, the stance adopted by the Commission on many issues of penology will inevitably influence the judges who have served as Commissioners, in their work on the bench. As this Court noted in its discussion of the Delegation Doctrine, the Commission has engaged in extensive investigation and legislative policy making. *Cf Scarfo* 783 F.2d 380 (Commission on Organized Crime did not prosecute, indict, or legislate). Certainly, participation in the development of this elaborate scheme cannot help but effect the ability of the Commissioner–Judges to serve impartially.

Recusal does not present the easy solution that it did in *Scarfo*. First, the Sentencing Guidelines affect a broad array of criminal matters, rather than the limited field of organized crime. Judges will be called upon to rule on the application of the Guidelines in circumstances ranging from guilty pleas to post-conviction relief. The provisions allowing for appellate review of sentences will have the effect of demanding attention in courts of appeals to matters at the heart of the Guideline's scheme. In addition, as more judges are appointed as Commissioners, the number of recusals will increase, transferring criminal sentencing work to other judges. It should be

noted, that judges are presumably chosen to serve on the Commission because of their expertise in criminal law. Therefore, the Judiciary will be deprived of leading decision makers in this complex area.

Finally the Commissioner–Judges, do to the expertise described above, and their reputations, will make objective decision making on the Guidelines, by their colleagues, difficult. "This can raise an obvious dilemma for a defendant who may be impelled to engage in subtle calculations concerning the possibility of offending the court by pointing too vigorously to alleged overreaching by fellow judges." *In re Sealed Case,* 838 F.2d at 517. Clearly, litigants will be faced with courts in whom they cannot fully place their trust to reach impartial decisions. *See Scaduto,* 763 F.2d at 1197. The Court concludes that placement of Article III judges on the Sentencing Commission interferes with the functioning of an impartial judiciary as mandated in the Constitution.

In addition, Commission members, including the Article III judges, subject themselves to direct Executive control, compromising the impartiality of the judiciary. *See United States v. Smith,* 686 F.Supp. 847 (D.Colo.1988). It is conceivable, for example, that situations will arise in which judge-members shall be told by the other four members of the commission whether they should spend time in their own courts, or attend commission meetings in Washington. *Id* 54 U.S. (13 How.) at 59. In broad terms, the Commission embodies "a union between the judiciary and the executive as a whole." *Id.* at 61. Nowhere is this union more in evidence than in the removal power given to the President. The members of the Commission may be removed "for neglect of duty or malfeasance in office or for other good cause shown." 28 U.S.C.A. § 991(a). "Power to remove an executive officer is important principally because it permits the President to control the performance of that officer." *In re Sealed Case,* 838 F.2d at 497; *See Bowsher v. Synar,* 106 S.Ct. at 3188 (To permit the execution of the laws to be invested in an officer answerable only

to Congress would, in practical terms, reserve in Congress control over the execution of the laws.) The composition of the Sentencing Commission is an unconstitutional union between the judiciary and the executive branch for the performance of primarily legislative tasks. Control ultimately rests with the executive. This union seriously impairs the judicial function as outlined in Article III.

Finally, the Court must determine whether some overriding governmental interests warrants the disruption described above. *See Nixon v. Admin'r,* 97 S.Ct. at 2790. The Court concludes that no such interest exists. It would, of course, have been possible for Congress itself to enact these Guidelines or similar legislation. In addition, a Commission with no judges sitting as members could have done so. Regardless of what kind of body made such policy choices, judges could have provided input without offending the Constitution. Thus, the knowledge and opinions of Federal Judges were available to a Constitutionally composed authority. For the foregoing reasons, this Court holds that the composition of the Sentencing Commission violates principles of separation of powers. First, the Judiciary has encroached into a legislative function. Second, and most significant, the activities of the judges serving on the Commission threaten disruption of the constitutionally assigned duties of the Judicial Branch.

### ARTICLE III

Just as Congress cannot assign non-judicial duties to the Judiciary, see *Hayburn's Case, supra,* it cannot assign judicial duties to the Executive Branch. This challenge to the guidelines system is not simply the "flip" side of the non-delegation principle. Rather, it has a completely independent separation of power basis, finding its energy in Section 1, Article III of the Constitution which provides, in part:

> The judicial power of the United States will be vested in one supreme court and in such inferior courts as the Congress may from time to time ordain and establish.

The exercise of sentencing discretion is, and has always been, a "judicial power."

In this case, Mr. Brittman was charged and convicted of violating Title 18 U.S.C. § 2113 a and d. Those sections provide:

(a) Whoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another anyproperty or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank, credit union, or any savings and loan association;

\*   \*   \*   \*   \*   \*

Shall be fined not more than $250,000 or imprisoned not more than twenty years, or both.

(d) Whoever, in committing, or in attempting to commit, any offense defined in subsections (a) and (b) of this section, assaults any person or puts in jeopardy the life of any person by the use of a dangerous weapon or device, shall be fined not more than $250,000, or imprisoned not more than twenty-five years, or both.

Since Mr. Brittman was charged with robbing a bank by putting "in jeopardy the life" of a person "by the use of a dangerous weapon or device," and the jury has convicted him of that crime, he may, under section 2113 d be "imprisoned not more than twenty-five years" and "fined not more than $250,000." Congress did not change or repeal section 2113 d when it passed the sentencing guidelines legislation. So the discretion which it created in that section still exists. Before November 1987, that discretion was vested in Article III judges. All acknowledge that if the guidelines are upheld, that broad exercise by the federal district judges of the sentencing discretion conferred by section 2113 d and the myriad other crime-penalty statutes will be drastically curtailed. Indeed, limiting and restricting the discretion of federal district judges can fairly be characterized as the heart and soul of the new guidelines system, the principal stated objectives being to reduce the perceived disparity in the sentences of such judges and to counteract the perceived leniency of their sentences.

But if most of the discretion stated in section 2113 d has been removed from Article III judges, it does not thereby simply disappear. So where does it go? It is clear from the reading of the Act that it went, first, to the Sentencing Commission which, through its promulgation and enactment of the guidelines, exercises part of that discretion by limiting the sentencing choices of Article III judges and, secondly, to the Justice Department (ordinarily acting through the offices of the U.S. Attorneys) which controls the new sentencing "grid" by controlling: (a) the charging mechanism, and (b) the factual picture that the Article III judge must act upon at the time of sentencing. Let us review these points.

■ The Sentencing Commission has legislated new minimum and maximum sentences. Its discretionary decisions in this regard, in turn, dramatically limit the discretionary sentencing ranges of trial judges. For instance, if the crime is bank robbery, the guideline is found in section 2 B 3.1 under the general title of "Robbery." The crime of robbery has a "base offense level" of 18, which, assuming there is no prior record, translates into a sentencing range of 27–33 months. This is a far step from the "0 to 25 years" found in section 2113 d. Although there are some exceptions, the clear purpose of the Act is "to cage" judicial discretion within certain Commission-prescribed parameters.

And once the guidelines are in place, then the Justice Department steps in to move the sentencing range about on the grid, thereby further determining the limits of the possible sentences. It can do this by its choice of the charges to be filed and also by its control over the facts that will be presented to the court in the event of a guilty plea. The U.S. attorneys can do this alone or in conjunction with the defense attorney during plea negotiations. Thus, the Executive Branch establishes the grid and then controls the two axes of that grid which, in turn, fixes the small range within

which true judicial discretion may still operate.

It is, of course, no answer to say that conscientious and ethical U.S. attorneys will not manipulate the system to obtain a plea or to establish a sentence. The point is that they *can*. In any event, by their actions and decisions, alone or in conjunction with defense counsel, they clearly and dramatically structure the sentence that must be imposed.

The Guidelines system will inevitably distort the exercise of prosecutorial discretion to a far greater degree than the pre-November 1987 law. The focus will not be only upon the most appropriate charge or charges to be filed in the light of the accused's conduct but upon the sentencing consequences that will result from the exercise of the prosecutor's discretion.

If one carefully reads all of the guidelines, all of the commentary, and all of the training manuals and booklets put out by of the Sentencing Commission, he or she will quickly realize that plea bargaining has become the centerpiece of this new crime management program. And it is important to note that the prosecutor and the defense attorney can maintain the same control over the court's discretion with or without the benefit of any formal plea agreement. If they can informally agree upon the charges and the factual picture or stipulation, the desired result will follow through the application of the guidelines without the necessity of entering into any formal plea agreement. The idea that conscientious judges can "police" such matters is both unrealistic and immaterial to the constitutional issue being discussed. Whether Congress can restrict judicial sentencing discretion to "zero" or confine it to narrow ranges by legislative act is also not at issue here. The point is that if Congress chooses to leave any discretion in the penalty statute it enacts, broad or narrow, it may not then transfer to the Executive Branch the power to exercise any of that sentencing discretion. The Government appears to partially agree with the Court's analysis. At page 8 of its brief, we find:

Indeed, in the early days of the Republic "the period of incarceration was generally prescribed with specificity by the legislature." *United States v. Grayson,* 438 U.S. 41, 45 [98 S.Ct. 2610, 2613, 57 L.Ed. 2d 582] (1978). This fact is highly significant for this case. Judges originally had no broad-ranging authority to define varying sentences; the practice of Congress prescribing wide sentence ranges with judges setting precise sentences came later. The Supreme Court has accordingly made clear that it is "indisputable" that "the authority to define and fix the punishment for crime is legislative," and includes the ability to direct judges as they actually impose a particular sentence. *Ex Parte United States,* 242 U.S. 27, 42 [37 S.Ct. 72, 74, 61 L.Ed. 129] (1916). For this reason, the Court has held that the federal courts cannot decline to impose a sentence. *Id.* See also *Whalen v. United States,* 445 U.S. 684, 689 [100 S.Ct. 1432, 1436, 63 L.Ed.2d 715] (1980) (determining punishment for crimes is a legislative function and courts cannot impose sentences not authorized by Congress); *United States v. Wiltberger,* 18 U.S. (5 Wheat.) 76, 93 [5 L.Ed. 37] (1820).

The function of the United States Parole Commission, which has been upheld by several courts, *See, e.g. Geraghty v. United States Parole Com'n,* 719 F.2d 1199 (3rd Cir.1983), is distinguishable from that of the Sentencing Commission. The parole context does not raise the due process problems inherent in the creation of the Sentencing Commission and the guidelines it adopted. First, the parole situation is distinct from the actual sentencing. *Geraghty,* 719 F.2d at 1208; *Joost v. United States Parole Com'n,* 535 F.Supp. 71, 74 (D.Kan.1982). After a judge enters a judgment and commitment order, the execution of the sentence imposed is an executive function. Part of that function includes ameliorative measures such as awarding statutory good time, granting pardons, and granting parole. *Joost,* 535 F.Supp. at 74. Therefore, the judicial sphere of discretion in sentencing remains intact even if an

executive agency determines the final release date.

Second, in the parole context the decision by an impartial judge as to the proper sentence constraines the executive determination of release date. "In granting or denying parole, the Parole Commission does not modify a trial court's sentence, but merely determines whether the individual will serve the sentence inside or outside the prison walls." *Artez v. Mulcrone,* 673 F.2d 1169, 1170 (10th Cir.1982). "The Commission may not require a prisoner to spend a single day in prison longer than his judicial sentence dictates regardless of whether it thinks that the judge mischaracterized the nature of the offense or the offender's potential for committing further harm. In addition the Commission may not release a prisoner even one day earlier than his judicially set parole eligibility date unless permission is obtained from the court." *Geraghty,* 719 F.2d at 1212.

In sum, the establishment of parole guidelines by an executive agency like the exercise of the Executive Power to Pardon or Reprieve, see Constitution Article III, section 2, did not "eviscerate the effect of the judge's selection of a particular sentence length." *Id.* The parole scheme allows Congress to set the statutory range, the courts impose sentences within the congressionally established limits, and the Commission establishes release dates within the eligibility range of the courts' sentences. *Id.*

By contrast, the scheme of the Sentencing Guidelines bypasses the crucial judicial function of setting individualized sentences. Under this scheme, a non-judicial Commission, rather than a trial court, sets the narrow range of penalties for a given offender. Courts, in the vast majority of cases, are bound to sentence within that range. Therefore, this sentencing scheme, unlike the work of the Parole Commission, eliminates a judicial sphere of discretion.

The Court notes that Judge John O. Kane, Jr., of the District Court of Colorado, in the case of *U.S.A. v. Bernard Smith,* 686 F.Supp. 847 (D.Colo. Mar. 25, 1988) approaches this issue with an interesting, if hamlet-like, ambivalence. He states:

> In my view a colorable argument can be made that the scheme itself serves to erode and undermine the function of the judiciary within our legal system. The parties have argued this point only peripherally. The whole process of sentencing demands a delicate distribution of power amongst the three arms of government. As I have pointed out at disconcerting length above, the determination of the sentence for a particular offense is a legislative function. The imposition of sentence is clearly a judicial function. In this regard it is said to be no different from the rendering of any other judgment. *United States v. Benz,* 282 U.S. 304, 311, 51 S.Ct. 113, 115, 75 L.Ed. 354 (1931). As such, there is a fine line between the two aspects of the process. The legislature may clearly specify a mandatory sentence for an offense. The legislature may, at least according to current jurisprudence, delegate to the executive some of its functions in this regard. But at some point the place of the judiciary within the process must be accounted for and a line must be imposed.

This Court disagrees with Judge Kane's statement that "the legislature may ... delegate to the executive some of its [sentencing] functions in this regard." The problem appears to go back to the Judge's analysis under the caption, "The Power to Sentence," starting at p. 859 of his opinion. There, Judge Kane states, "the contention that the general prescription of punishment for a criminal offense is in some way an inherently judicial function must be scotched." He then cites the U.S. Supreme Court's statement in *Whalen v. U.S.,* 445 U.S. 684, 689, 100 S.Ct. 1432, 1436, 63 L.Ed. 2d 715 (1980), as follows:

> [W]ithin our federal constitutional framework the legislative power, including the power to define criminal offenses and to prescribe the punishments to be imposed upon those found guilty of them, resides wholly with the Congress.

This Court wholeheartedly agrees. "Defining crimes and fixing penalties are legislative not judicial functions," *U.S. v. Evans,*

333 U.S. 483, 68 S.Ct. 634, 92 L.Ed. 823 (1948). "Legislators remain free to decide how much discretion in sentencing should be reposed in the judge or jury in non-capital cases," *Lockett v. Ohio*, 438 U.S. 586, 603, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978). But the point which Judge Kane apparently misses, or does not agree with, is that the exercise of whatever sentencing discretion is provided by the legislature is a *judicial power* that can only be exercised by members of the Third Branch. Yes, "prescription of punishment" is a legislative not a judicial function. The exercise of sentencing discretion, however, is a judicial power under Article III.

It is interesting to see the Judge of the Colorado Court struggle with this serious issue, one that obviously concerns him greatly. That issue is inextricably related to the "due process" issue which will be discussed in the next section of this opinion. It is this Court's view that if Judge Kane listened a bit more attentively to, and followed, the authority he cites in the last pages of his opinion, he would end up, as this Court has, by concluding that only the judiciary can exercise any discretion which the legislature leaves in its statutory criminal provisions. For instances, he cites Justice O'Dalaigh of the Supreme Court of Ireland, as follows:

> There is a clear distinction between the prescription of a fixed penalty and the selection of a penalty for a particular case. The prescription of a fixed penalty is the statement of a general rule, which is one of the characteristics of legislation; this is wholly different from the selection of a penalty to be imposed in an individual citizen's case; it states the general rule, and the application of that rule is for the Courts. If the general rule is enunciated in the form of a fixed penalty then all citizens convicted of the offense must bear the same punishment. But if the rule is stated by reference to a range of penalties to be chosen from according to the circumstances of the particular case, then a choice or election of penalty falls to be made.
>
> At that point the matter has passed from the legislative domain. Traditionally, as

I have said, the choice has lain with the Courts. Where the Legislature has prescribed a range of penalties the individual citizen who has committed an offence is safeguarded from the Executive's displeasure by the choice of penalty being in the determination of an independent judge. The individual citizen needs the safeguard of the Courts in the assessment of punishment as much as on his trial for the offence. The degree of punishment which a particular citizen is to undergo for an offence is a matter vitally affecting his liberty; and it is inconceivable to my mind that a Constitution which is broadly based on the doctrine of separation of powers ... could have intended to place in the hands of the Executive the power to select the punishment to be undergone by citizens. It would not be too strong to characterize such a system of government as one of arbitrary power. *Deaton v. The Attorney General*, (1963) I.R. 170, 180.

He then shows how this same principle was applied by the privy counsel in *Hinds v. The Queen*, (1977) A.C. 198, to wit:

> Parliament, in the exercise of its legislative power, may make a law imposing limits upon the discretion of the judges who preside over the courts by whom offenses against that law are tried to inflict on an individual offender a custodial sentence the length of which reflects the judge's own assessment of the gravity of the offender's conduct in the particular circumstances of the case. What Parliament cannot do, consistently with the separation of powers, is to transfer from the judiciary to any executive body whose members are not ... [judicial officers] ... a discretion to determine the severity of the punishment to be inflicted upon an individual member of a class of offenders.

After citing this strong authority, Judge Kane expresses his own concern:

> Of course, under the Sentencing Reform Act, the executive in theory does not determine the sentence for a particular defendant. But a line must exist, a border must be drawn between situations

where the executive is given the power to determine broad categories of defendants on the one hand, and those where the classes drawn up are so narrow, so specific, where the judge's discretion is so paralyzed that the executive is in effect determining individual sentences. Where this occurs, no technical appellation for what happens will save the process from its tyrannical reality. If the Sentencing Commission guidelines have not yet reached this stage, they come extremely close to it, and indeed seem destined to reach it in the future.

It is suggested that one of the problems arises from the fact that we keep talking about "guidelines" but we are not dealing with guidelines. As stated by Judge Heaney in *U.S.A. v. Jesus Estrada,* 680 F.Supp. 1312, 1317 (D.Minn.1988):

> The guidelines are not advisory. Rather, federal judges must:
>
>> impose a sentence of the kind, and within the range [set forth in the guidelines] ... unless [the judge] finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, that was not adequately taken into consideration by the Sentencing Commission in formulating the guidelines [and] that should result in a sentence different from that described.

Title 18 U.S.C. § 3553(b) (as amended by Pub.L. No. 100–182, Dec. 7, 1987). Properly interpreted, "guidelines" would be used to guide and inform the discretion of the court. But the sentencing guidelines we are dealing with here *mandate* a certain judicial response. Yes, Congress could set forth guidelines that it wished courts to follow in exercising the judicial sentencing power. For example, if it felt that first-time "white collar" offenders ought to be put in prison rather than on probation, they could say so in a guideline and courts would, absent some strong overriding reason in the individual case, follow the legislative policy reflected in such a guideline. But that is not at all what we are about here.

Recognizing that his analysis had led him close to an inconsistency with his previous decision, Judge Kane states:

> I am not casting any doubt upon my previous holding that the legislature may validly delegate to the executive the power to draw up general guidelines to assist judges in making sentencing decisions. I think my argument is more sophisticated. I am asserting that those guidelines, once drawn up, must not result in a situation where in fact each individual coming before a court for sentencing has his own sentence predetermined by a non-judicial body. The fragile balance involved is well illustrated by the remarks of the Supreme Court in *Ex Parte United States,* 242 U.S. 27, 43, 37 S.Ct. 72, 74–75, 61 L.Ed. 129 (1916).

> Indisputably under our constitutional system the right to try offenses against the criminal laws and upon conviction to impose the punishment provided by law is judicial, and it is equally to be conceded that in exerting the powers vested in them on such subject, courts inherently possess ample right to exercise reasonable, that is, judicial, discretion.... indisputable also is it that the authority to define and fix the punishment for crime is legislative and includes the right in advance to bring within judicial discretion ... elements of consideration which would be otherwise beyond the scope of judicial authority....

Nor would such a scheme be saved by having it comprised completely of federal judges once, as explained above, its fundamental nature remained executive.

This concern springs from the right of every citizen convicted of an offense to have his punishment determined by a judge from within the parameters laid down by Congress, and his correlative right not to have the choice predetermined in his individual case by a non-judicial body. As the Supreme Court asserted in *Tumey v. Ohio,* 273 U.S. 510, 533–534, 47 S.Ct. 437, 445, 71 L.Ed. 749 (1927), a judge "is given the judicial duty first, of determining whether the defend-

ant is guilty and second having found his guilt to measure his punishment."

Judge Kane then concludes:

I strongly question whether the rigid calculations a judge must administer and follow in the case of each defendant under this scheme is commensurate with any of these descriptions of judicial power. I strongly question whether a detailed scheme of the nature of these guidelines really amounts to no more than a general mandatory sentence, or whether it amounts in fact to a predetermination of each individual's sentence by a body other than the judiciary. I strongly question whether these guidelines are designed to assist a judge in making the most difficult of decisions, or whether it amounts to a legislative instruction as to how those decisions must be made. In short, I strongly doubt whether this scheme, even if stripped of its technical deficiencies can pass general constitutional muster, if it can, then I strongly doubt the continued vitality of principles of judicial independence, fairness of procedure and individual justice for individual citizens. These are concepts, I fear, which no computer data banks can comprehend.

■ This Court shares the concern but not the doubt expressed. It chooses to opt for the clear-cut principle that the exercise of any sentencing discretion permitted by the legislature may not be delegated to the Executive Branch of our Government. We hold therefore that Congress' attempt to delegate the exercise of such discretion to the Commission and to the Justice Department violates Article III, Section 1 of the U.S. Constitution.

## DUE PROCESS

Closely related to the Article III issues are certain due process issues—not the myriad due process issues that will arise if the Guidelines are upheld, but those fundamentally affecting the role of the judiciary and the right of individuals to personal rather than mechanical treatment in sentencing.

■ This Court holds that the structure of the Guidelines violates Separation of Powers by removing a sphere of discretion created by Congress which is inherently judicial. As a corollary, the Guidelines violate a defendant's due process right to individualized sentencing. *See, generally, United States v. Ortega Lopez,* 684 F.Supp. 1506 (C.D.Cal.1988) (en banc); *United States v. Bolding,* 683 F.Supp. 1003 (D.Md.1988); *United States v. Frank,* 682 F.Supp. 815 (W.D.Pa.1988); *United States v. Smith,* 686 F.Supp. 847 (D.Colo.1988).

Why is it important to leave broad sentencing discretion in independent federal trial judges? Judge Gerald Heaney has ably summarized those reasons:

Some of the reasons for leaving individual judges wide discretion are based on the idea that rehabilitation should serve as a philosophical basis for imposition of punishment. Other reasons have continuing validity, even though the idea that imprisonment may serve rehabilitative goals has largely been abandoned. Foremost is the recognition that extraordinarily important and complex sentencing decisions often must be made at a time when passions in the community are exceedingly high. Therefore, it was thought wise and just to place such a decision in the hands of the most politically insulated branch of government— the judiciary. In addition, the importance of the sentencing decision required that it be placed in the hands of one individual who would bear the responsibility for it. Indeed, the responsibility is a heavy one. Of all of the tasks of a district judge, none is more difficult than imposing a sentence of imprisonment. Finally, since sentencing involves a most extreme deprivation of personal liberty, it calls for a highly individualized process. Accordingly, rather than attempting to prescribe punishments that take into account the entire range of possible human conduct and all its underlying motivations, Congress chose to delegate the task to judges, who, although imperfect at times, could exercise wisdom and insight far superior to any that could be

captured in the abstract and codified or computerized.

*U.S. v. Estrada,* 680 F.Supp. 1312, 1317–1318 (D.Minn.1988).

It is true that Congress may have the power to fix definite sentences for crime. However, once Congress has decided to set only a permissible range of sentences for each crime, it creates a sphere of discretion. That discretion is properly judicial in nature. First, constitutional safeguards guarantee the independence of the judiciary. Therefore, defendants are protected from a meshing of the sentencing authority with the prosecution function, which would occur if part of the overall sentencing discretion were vested in the executive. In addition defendants are protected from the influence of outraged majorities inherent when sentencing discretion is granted to either the legislature or the executive. In short, this sphere of sentencing discretion creates a "case or controversy" properly decided by an Article III judge. The transfer of that discretion to the Sentencing Commission and the Justice Department, related as they are to both Congress and the President, violates Separation of Powers.

In addition, defendants enjoy a due process right to individualized sentencing. The Guidelines impose mechanical formulas and resulting narrow ranges of sentences. They eliminate the traditional judicial function of imposing sentences according to particular facts of each case. This Court must ask whether under the Guidelines "the four corners of the record indicate that ... each individual defendant [can be] assessed and sentenced *as* an individual." *United States v. Barker,* 771 F.2d 1362, 1366 (9th Cir.1985). In *Barker,* the court invalidated, as an abuse of discretion, the wooden imposition of the statutory maximum sentence without consideration of individualized factors. The court stated, "[p]unishment should fit the offender and not merely the crime. The belief no longer prevails that every offense in a like category calls for an identical punishment without regard to the past life and habits of a particular offender." *Id.* at 1365 (quoting) *Williams v. New York,* 337 U.S. 241, 247, 69 S.Ct. 1079, 1083, 93 L.Ed. 1337 (1949). *See* also, *United States v. Grayson,* 438 U.S. 41, 98 S.Ct. 2610, 2614, 57 L.Ed.2d 582 (1978) (upholding the use at sentencing of the trial court's observation of a defendant's perjury).

The approach of the Guidelines is at odds with the principle of individualized sentencing. It is true that the Guidelines do enumerate factors pertinent to the offender. However, the weight to be accorded each factor is predetermined and rigid. Therefore, judges are not truly free to consider aggravating or mitigating factors as they apply to specific offenders. For example, the career offender provisions, employed in the instant case, fail to distinguish between the gravity of previous offenses. That fact mandates that a defendant with a history of two murder convictions be sentenced within the same range as a defendant with two prior purse snatching convictions.

To be more specific, Guideline § 4B1.1 provides:

*Career Offender*

A defendant is a career offender if (1) the defendant was at least eighteen years old at the time of the instant offense, (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense, and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense. If the offense level for a career criminal from the table below is greater than the offense level otherwise applicable, the offense level from the table below shall apply. A career offender's criminal history category in every case shall be Category VI.

| Offense Statutory Maximum | Offense Level |
| --- | --- |
| (A) Life | 37 |
| (B) 25 years or more | 34 |
| (C) 20 years or more, but less than 25 | 32 |

| Offense Statutory Maximum | Offense Level |
|---|---|
| (D) 15 years or more, but less than 20 | 29 |
| (E) 10 years or more, but less than 15 | 24 |
| (F) 5 years or more, but less than 10 | 17 |
| (G) More than 1 year, but less than 5 | 12 |

In this case, Mr. Brittman was, upon a plea of guilty, convicted in state court when he was nineteen of the crime of aggravated robbery and sentenced to ten years imprisonment. Two years earlier, when he was seventeen, he pled guilty to robbery and theft of property and was sentenced as an adult in circuit court to five years. According to the presentence report, this sentence arose out of the following circumstances: "The defendant and two others struck the victim, knocked her against her vehicle and took her purse." Without the "career offender" provision, the defendant's criminal history computation would have placed him in Category IV. The presentence report then states, "However, since it has been determined that the defendant is a career offender under Guideline § 4B1.1, the defendant's criminal history category shall be VI." The "total offense level" calculated by the Probation Office is 28. The sentence range at that offense level for Category IV offenders is 110–137 months. The "offense statutory maximum" under Guideline § 4B1.1 is "25 years or more" which gives an offense level of 34 under the "career offender" provision. And, as noted by the probation report, said guideline states that the "career offender's criminal history category in every case shall be Category VI." So what is the consequence to Mr. Brittman in 1988 of his having snatched the lady's purse back in 1979 when he was seventeen years of age? The answer is: His sentence, here and now, must be between 262 months and 300 months (the 25 year maximum) instead of from 110–137 months. So he faces a sentence of from 21 to 25 years because of the purse snatching crime instead of a sentence between 9 and 11 years. It is interesting to follow through on this.

Why was the crime Mr. Brittman committed when he was seventeen years of age "a crime of violence"? Guideline § 4B1.2 states, "the term 'crime of violence' as used in this provision is defined under 18 U.S.C. § 16." That section states:

"(a) An offense that has as an element the use, attempted use or threatened use of physical force against the person or property of another, or

(b) Any other offense that is a felony that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of the offense."

So we see that not only has the Congress given the Commission the power to define conduct and attached penalties thereto, but the Commission, in turn, has delegated the definition of this "federal offense" to the state. This is because (as we are told by the Sentencing Commission) we must look to state law to determine if an element of the Arkansas crimes of "robbery and theft of property" is the "use, attempted use, or threatened use of physical force against the person or property of another." Section 5–12–102, of the Arkansas Code, 1987 Annotated, states:

"A person commits robbery if, with the purpose of committing a theft ... he employs or threatens to immediately employ physical force upon another."

So snatching a purse under the circumstances reflected by the presentence report would be a "robbery," under Arkansas law, which has as an element "the use or threatened use of physical force against a person." And, as pointed out above, Mr. Brittman is in no different position than he would have been had that "crime of violence" been murder. This actual example surely epitomizes the happenstantial and idiosyncratic effect of these mandatory rules, euphemistically called "guidelines." It is inevitable that such mandatory limits upon judicial discretion will result in such absurd consequences. Nothing could better eliminate the due process argument being presented here.

"Further, the Guidelines offend the guaranties of due process by depriving the defendant of the opportunity to affect the court's weighing of all relevant factors at the time of sentencing." *Ortega Lopez*, at 1513. Therefore, the Court concludes that the guidelines system offends separation of powers and due process principles by eliminating board judicial discretion to impose individualized penalties within the congressionally established range.

The Court is impressed with the understanding reflected in the decision of the Maryland District Court in *Bolding, supra,* at 1004–1005, to wit:

The constitutional infirmities which we perceive in the Act are simple and straightforward. They stem from our understanding of the respective roles of the legislative and judicial branches in the sentencing process and from what we believe to be the fundamental meaning of due process. We start from the premise that Congress has the power to mandate minimum as well as maximum sentences of definite duration and amount, subject only to the proportionality requirement of the Eighth Amendment. In setting such sentences the members of Congress are, as the elected representatives of the people, themselves accepting responsibility for the deprivation of liberty which their action entails. However, when Congress does not set definite sentences but rather a range of potential sentences, it has created a sphere of discretionary power which is inherently judicial in nature. The Sentencing Reform Act and the mandatory guidelines promulgated thereunder so narrowly restrict the exercise of the courts' discretion that they effectively negate it. *See Nixon v. Administrator of General Services*, 433 U.S. 425, 443, 97 S.Ct. 2777, 2790, 53 L.Ed.2d 867 (1977); *United States v. Klein*, 80 U.S. (13 Wall.) 128, 147, 20 L.Ed. 519 (1871); *cf. United States v. Brainer*, 691 F.2d 691, 697 (4th Cir.1982). Thus, the effect of the Act and the guidelines is to violate the separation of powers doctrine by transferring judicial power from the federal courts, whose independence of judgment is constitutionally

secured, to the Sentencing Commission, whose fealty to Congress and the President is statutorily prescribed.

Of related and equal concern to this institutional infirmity is a broader problem of due process—a concern for the fair treatment of each defendant. We do not hold that the Constitution guarantees to a defendant (at least in non-capital cases) "individual sentencing." However, when a definite sentence is not statutorily mandated, a defendant being deprived of his liberty pursuant to a statute which sets a sentencing range is constitutionally entitled to an articulated exercise of discretion by the judge before whom he appears rather than to the mechanical application of formulae adopted by non-constitutional commissioners invisible to him and to the general public. The essence of due process is accountability, reason and a fair opportunity to be heard. These cannot be replaced by any administrative code, however extensively considered or precisely drawn.

Because we find that the Sentencing Reform Act impermissibly places in the Sentencing Commission discretionary power entrusted by the Constitution to the federal judiciary, we need not decide the other constitutional issues raised by defendant.

CONCLUSION

If the authority and role of the Sentencing Commission are ultimately upheld, the Judicial Branch will thereafter be the servant of an administrative agency in this most sensitive area of individual human rights. The relation will become one of close symbiotic co-existence in which the agency monitors and controls the actions of Article III judges on a daily basis. The concept of judicial independence will suffer a devastating blow. And the effect of such a precedent would be ominous indeed.

Fortunately, for the reasons stated in the opinion above, the Constitution—this wise and wonderful work—with its bedrock "separation of powers" concept of government, does not permit this arrangement.

The Sentencing Commission and the Sentencing Guidelines are unconstitutional.