**UNITED STATES of America,**

v.

**Arturo ALAFRIZ, Defendant.**

**UNITED STATES of America,**

v.

**Rafael PEREZ and Juan Henriquez Mercado, Defendants.**

**UNITED STATES of America,**

v.

**Levoster CHANDLER, Defendant.**

**Nos. S 88 Cr. 0002 (RWS), 88 Cr. 200 (RWS) and 88 Cr. 100 (RWS).**

United States District Court, S.D. New York.

July 6, 1988.

---

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City (Reid M. Figel, Peter B. Sobol, Frances M. Fragos, Asst. U.S. Attys., of counsel), for U.S.

Ronald Carmon, New York City, for defendant Alafriz.

The Legal Aid Society, New York City (Abraham L. Clott, Paul Davison, of counsel), for defendant Perez.

Roger J. Schwarz, New York City, for defendant Mercado.

The Legal Aid Society, New York City (Ruth Chamberlain, of counsel), for defendant Chandler.

## OPINION

SWEET, District Judge.

In three separate cases before this court, criminal defendants, subject to sentencing under the Sentencing Guidelines (the "Guidelines") recently promulgated by the United States Sentencing Commission (the "Commission"), have challenged the Guidelines' constitutionality. Defendant Arturo Alafriz ("Alafriz") pleaded guilty to the crimes of which he is accused,[1] and co-defendants Juan Mercado ("Mercado") and Rafael Perez ("Perez")[2] and defendant Levoster Chandler ("Chandler") will decide whether to assert their right to trial based on the outcome of this motion.[3] For the reasons set forth below, this court holds that the Guidelines are unconstitutional.

1. Alafriz has pleaded guilty to two counts of cashing stolen bank checks in violation of 18 U.S.C. § 1344 and one count of negotiating forged securities in violation of 18 U.S.C. § 513.

2. Mercado and Perez are charged with conspiracy to distribute and possession with intent to distribute a controlled substance and with the substantive offense of possession with intent to distribute in violation of 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(B), and 846, and 18 U.S.C. § 2. Perez is charged with use of a firearm in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1). Also pending in the case of Mercado and Perez is a motion for suppression of evidence. That motion will not be addressed in this opinion.

Chandler is charged with one count of distribution of narcotics within 1,000 feet of a school in violation of 21 U.S.C. §§ 845(a), 812, 841(a)(1), and 841(b)(1)(C), and with possession of narcotics with intent to distribute in violation of 21 U.S.C. §§ 812, 841(a)(1) and 841(b)(1)(C).

3. This court ruled from the bench during oral argument on June 10, 1988 that Mercado and Perez' challenge is ripe for adjudication because the outcome of this motion will affect whether these defendants plead guilty. *See also United States v. Olivencia*, 689 F.Supp. 1319, 1322–23 (S.D.N.Y.1988) (Leisure, J.) (setting forth reasons for pre-plea ripeness).

*Statutory Background*

The Commission was established pursuant to the Comprehensive Crime Control Act of 1984[4] as "an independent commission in the judicial branch of the United States" organized to "establish sentencing policies and practices for the criminal justice system." 28 U.S.C. § 991. The commission is to consist of seven voting and one nonvoting member, the voting members appointed by the President after consultation with criminal justice professionals. *Id.* at § 991(a). The Commission is to be bi-partisan. *Id.* At least three members are to be federal judges, and the Attorney General or his designee is to be an *ex officio* nonvoting member. *Id.* All voting members are subject to removal by the President for cause. *Id.* They are to serve staggered six year terms, each member eligible for reappointment to one additional term. 28 U.S.C. § 992.

The purpose of the Commission is to: (1) establish sentencing policies and practices for the Federal criminal justice system that—

(A) assure the meeting of the purposes of sentencing as set forth in section 3553(a)2) of title 18, United States Code;

(B) provide certainty and fairness in meeting the purposes of sentencing, avoiding unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct while maintaining sufficient flexibility to permit individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices; and

(C) reflect, to the extent practicable, advancement in knowledge of human behavior as it relates to the criminal justice process; and

(2) develop means of measuring the degree to which the sentencing, penal, and correctional practices are effective in meeting the purposes of sentencing as set forth in section 3553(a)(2) of title 18, United States Code.

28 U.S.C. § 991(b). Thus it is their duty to promulgate guidelines reflecting these policies. *Id.* at § 994.

The broader congressional purpose behind the Commission and the Guidelines was to reduce disparity in sentencing practices nationwide. S.Rep. No. 225, 98th Cong., 1st Sess. 37–52 (1983), reprinted in U.S.Code Cong. & Admin.News 1984, 3182, 3220–35. Thus, Congress abolished the Parole Commission which it felt contributed to disparity and ordered the Commission to create more rigid sentencing rules. *Id.* at 3229–32, 3235. Additionally, the Commission wished to change what it perceived were common sentencing practice which did not follow mandatory minimum sentences in drug related offenses, and which tended to offer excessive leniency towards economic offenders. See Guidelines, ch. 1, part A, § 3 at 1.4.

The Guidelines, as promulgated by the Commission, are essentially a detailed list of charts and formulae. They set forth all federal crimes and assign to those crimes an offense level specified by point score. These levels are said to be derived from a study of presentence reports except where they are not. Guidelines, Ch. 1, part A, § 3 at 1.4. Within each category of crime are aggravating circumstances. These, if present, call for a specified increase in the number of points. Further, there are additional aggravating and mitigating circumstances relating to the offender which either increase or reduce the offense level by adding or subtracting points. Finally, a criminal history category is calculated, thus placing the offender in the appropriate criminal history category after all calculations are made.

The total offense level plus criminal history category indicates the range of the sentence the defendant is to receive. The calculations themselves are initially made by the Department of Probation, and the government and the defendant is given an opportunity to object to the calculus and to

---

**4.** Pub.L. No. 98–473, 98 Stat. 1837, 2017.

present grounds for departure from the Guidelines.

The sentencing judge is authorized to depart for causes not adequately considered by the Commission in formulating the Guidelines. 18 U.S.C. § 3553(b). Guidelines sentences are appealable either on the grounds of miscalculation or of departure. If the judge has imposed a sentence higher than one Guidelines dictate, the defendant may appeal. If it is lower, the government may appeal. The Guidelines thus radically alter the practices and process by which sentences have been determined in the federal courts for over 100 years. *United States v. Grayson*, 438 U.S. 41, 46 & n. 5, 98 S.Ct. 2610, 2613 & n. 5, 57 L.Ed.2d 582 (1978).

## Discussion

The constitutional challenges before this court are only three of scores that have been filed and determined almost daily across this country. At least one entire district, sitting *en banc*, has held them unconstitutional.[5] Other districts have split on the issue.[6] This question is so divisive of the courts and so crucial to futures of individuals that the Supreme Court has granted an expedited appeal from a district court decision.[7] Despite several excellent opinions on this question,[8] which are hereby adopted, this opinion will be filed in an effort to emphasize particular points and to state others not previously asserted.

## Article III and Due Process as a Case or Controversy

Article III to the Constitution states that The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish.

. . . . .

The judicial Power shall extent to all Cases, in Law and Equity, ... [and] to Controversies....

This mandate, that Article III courts are to determine cases and controversies, limits Congress in its power to delegate adjudicative responsibilities to non-Article III bodies.[9] Although Congress may grant administrative agencies the power to adjudicate questions of entitlement within that agency's sphere of expertise,[10] *see Crowell v. Benson*, 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1982) (Employees' Compensation Commission may act as an adjudicative fact finding tribunal on workers compensation claim and neither party is entitled to trial *de novo* ), in *Northern Pipeline Construction Co. v. Marathon Pipeline Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), the Supreme Court held that the legislature could not empower non-Article III judges to preside definitively over cases concerning rights not created by Congress itself. Moreover, when a claim of constitutional right arises in the context of an agency adjudication, a court will generally make its own independent judgment rather

---

5. *United States v. Lopez,* 684 F.Supp. 1506 (C.D. Cal.1988) (*en banc* ).

6. *Compare, e.g., United States v. Mendez,* 691 F.Supp. 656 (S.D.N.Y.1988) (Westlaw, Allfeds) (guidelines unconstitutional), *United States v. Olivencia, supra,* (same); *United States v. Brodie,* 686 F.Supp. 941 (D.D.C.1988) (Westlaw, Allfeds) (same); *United States v. Brittman,* 687 F.Supp. 1329 (E.D.Ark.1988) (Westlaw, Allfeds) (same); *United States v. Dibiase,* 687 F.Supp. 38 (D.Conn.1988) (same) with *United States v. Ruiz–Villaneuva,* 680 F.Supp. 1411 (S.D.Cal.1988) (upholding the Guidelines); *United States v. Alves,* 688 F.Supp. 70 (D.Mass.1988) (Westlaw, Allfeds) (same); *United States v. Richardson,* 685 F.Supp. 111 (E.D.N.C.1988) (same).

7. *United States v. Johnson,* 682 F.Supp. 1033 (W.D.Mo.), *cert. denied sub. nom.; United States v. Mistretta,* —— U.S. ——, 108 S.Ct. 2818, 100 L.Ed.2d 920 (1988).

8. *See* particularly Judge Eisele's opinion in *United States v. Brittman, supra,* Judge Greene's opinion in *United States v. Brodie, supra,* Judge Leisure's opinion in *United States v. Olivencia, supra* and Judge Mukasey's opinion in *United States v. Mendez,* 691 F.Supp. 656 (S.D.N.Y.1988).

9. The non-delegation doctrine in general will be discussed in greater detail below.

10. Such adjudications, however, would be subject to some level of judicial review under the Administrative Procedure Act, discussed below.

than rely on the agency's fact finding on that matter. *See Id.* at 78–79, 102 S.Ct. at 2875; *see also Ng Fung Ho v. White,* 259 U.S. 276, 284–85, 42 S.Ct. 492, 495, 66 L.Ed. 938 (1922); *Crowell,* 285 U.S. at 46, 52 S.Ct. at 290.

In the view of this judge the most vital claims of constitutional right are involved in sentencing. Consistently, the most difficult and agonizing decision a judge has to make is the punishment to be imposed upon an individual defendant in the light of the crime committed, the standard of the community where the crime was committed, the resources available for treatment or incarceration, the possibility of rehabilitation, and most significantly, the *mens rea* of the defendant. Individual justice is required to give the process not only moral but constitutional validity. Under the Constitution, no individual may be deprived of his liberty, a fundamental right, without due process of law. The questions then become how much process is due, and who decides whether a given individual has received the process that is due and does Congress have the power to limit the courts' authority to decide cases involving constitutional issues.

The procedural protections afforded defendants in the sentencing stage of a criminal proceeding have evolved greatly from their common law roots. Prior to the enactment of English statutes prescribing specific punishment, all felonies were punishable by death. *See* 11 W. Holdsworth, The History of English Law 557 (1938).

As time went on, the English legislature enacted statutes that specifically prescribed the punishment to be meted out for any given offense. These statutes were often harsh and unpredictable. William Holdsworth in his history of English law sets forth a mid-eighteenth century example:

> [T]he punishments inflicted were unsystematic because they were inflicted by many unconnected statutes which come from all periods of the history of the law.... [T]his influence of the old common law principle, that all felonies were punishable with death, had three

consequences which had the worst results on the criminal law. In the first place, larceny of a chattel above the value of twelve pence was grand larceny and punishable with death. The cruelty of this law was so manifest that juries frequently committed "a kind of pius perjury," and either acquitted, or, as Kenny has said, "assessed the value or stolen articles in a humanely depreciatory manner." In the second place, this severity led to a very capricious infliction of punishment. The Crown could not allow the death sentence to be carried out on all petty thieves. But the operation of pardons on condition of transportation or otherwise, coupled with the chance of quashing the indictment for a technical flaw, made it quite uncertain what punishment would be.... In the third place, the severity of the common law exercised a perverting influence on the Legislature. It induced the Legislature to punish with death many other offenses against property which did not come within the narrow common law definition of larceny, and other acts which in themselves would appear to be almost innocent.

11 W. Holdsworth, The History of English Law 559–60 (1938). Thus, even under statutory law, death was the primary punishment for felony. Only the method of execution varied from crime to crime, the method also being prescribed by statute.

That the legislature determined the method of punishment was considered a virtue in its day. As Blackstone wrote:

> And it is moreover one of the glories of our English law, that the nature, though not always the quantity or degree, of punishment is *ascertained* for every offence; and that it is not left in the breast of any judge, nor even of a jury, to alter that judgment, which the law has beforehand ordained, for every subject alike, without respect of persons. For if judgments were to be the private opinions of the judge, men would then be slaves to their magistrates; and would live in society, without knowing exactly the conditions and obligations which it laws them under. And besides, as this prevents

oppression on the one hand, so on the other it stifles all hopes of impunity or mitigation; with which an offender might flatter himself, if his punishment depended on the humor or discretion of the court.

4 Blackstone, Commentaries 371 (emphasis in original). However, even at a time when the exercise of judicial discretion was viewed as an unwelcome event, judges were still afforded discretion in determining the length of prison stays and the amount of fines. Blackstone continued:

> The discretionary fines and discretionary length of imprisonment, which our courts are enabled to impose, may seem an exception to this rule. But the general nature of the punishment, *viz.* by fine or imprisonment, is in these cases fixed and determinate: though the duration and quantity of each must frequently vary, from the aggravations or otherwise of the offence, the quality and condition of the parties, and from innumerable other circumstances. The *quantum*, in particular of pecuniary fines neither can, nor ought to be, ascertained by any invariable law.

*Id.*

Punishment was similarly viewed in the early days of this country.

> In the early days of the Republic, when imprisonment had only recently emerged as an alternative to the death penalty, confinement in public stocks, or whipping in the town square, the period of incarceration was generally prescribed with specificity by the legislature. Each crime had its defined punishment.... ·

*United States v. Grayson,* 438 U.S. 41, 45, 98 S.Ct. 2610, 2613, 57 L.Ed.2d 582 (1978). However, as set forth by the Supreme Court in *Grayson,* an evolution in sentencing began to take place in this country, and judges were permitted to exercise broader discretion.

The "excessive rigidity of the [mandatory or fixed sentence] system" soon gave way in some jurisdictions, however, to a scheme permitting the sentencing judge—or jury—to consider aggravating and mitigating circumstances surrounding an offense, and, on that basis, to select a sentence within a range defined by the legislature.

*Id.* at 46, 98 S.Ct. at 2613. At first the changes in procedures were tailored to more carefully fit the crime, with retribution as the primary goal of punishment. *Id.* However, as our legal system matured, concern for the individual entered into the calculus, and an emphasis was placed not only on the offense, but on the offender as an individual. *Id.* at 46–48, 98 S.Ct. at 2613–14.

By the middle of this century, sentencing practices had come full circle. In order to insure that a defendant received the punishment best tailored to his individual situation—e.g. what was the crime, what punishment is deserved, what are this individual's chances for rehabilitation, is he penitent, etc.—judges were directed to consider a virtually unlimited number of highly individualized factors thus exercising a necessarily broad range of discretion.

In *Williams v. New York,* 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949), the Supreme Court set forth modern sentencing philosophy upon which sentencing courts must base their procedures and upon which defendants have come to rely [11]:

> Highly relevant—if not essential—to [the sentencing judge's] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendants's life and characteristics.
>
> . . . . .
>
> The belief no longer prevails that every offense in a like category calls for an identical punishment without regard to the past life and habits of a particular

---

**11.** *Williams* challenged the sentencing judge's use of information with respect to his previous convictions as an aggravating circumstance. He claimed that past crimes should not be considered unless he were permitted to cross examine witnesses regarding this information, and that failure to allow cross examination constituted a denial of due process. The court denied his challenge and set forth, as is stated in text, the necessity of unlimited information and broad discretion in carrying out the sentencing process.

offender. This whole country has traveled far from the period in which the death sentence was an automatic and commonplace result of convictions—even for offenses today deemed trivial. Today's philosophy of individualizing sentences makes sharp distinctions for example between first and repeated offenders.

. . . . .

[I]ndeterminate sentences and probation have resulted in an increase in the discretionary powers exercised in fixing punishments.... [A] strong motivating force for the changes has been the belief that by careful study of the lives and personalities of convicted offenders many could be less severely punished and restored sooner to complete freedom and useful citizenship.

. . . . .

To deprive sentencing judges of this kind of information would undermine modern penological procedural policies that have been cautiously adopted throughout the nation after careful consideration and experimentation.

*Id.* at 247–50, 69 S.Ct. at 1083–84.

More recent cases hold that individualized sentencing is a defendant's right. *See United States v. Barker,* 771 F.2d 1362 (9th Cir.1985); *United States v. Wardlaw,* 576 F.2d 932, 938 (1st Cir.1978); *United States v. Thompson,* 483 F.2d 527 (3d Cir. 1973). Indicating that this requirement constitutes the process that is due any given defendant, the Ninth Circuit stated in *Barker:* "Our concern is less the appropriateness of a given criminal sentence that the propriety of the process through which the sentence was imposed." 771 F.2d at 1365. The court went on to say:

Central to our system of values and implicit in the requirement of individualized sentencing is the categorical imperative that no person may be used merely as an instrument of social policy, that human beings are to be treated not simply as means to a social end like deterrence, but also—and always—as ends in themselves.

*Id.* at 1368–69 (citing Kant, Tribe, Dworkin, and the Court of Appeals for the District of Columbia Circuit); *see also United States v. Baker,* 487 F.2d 360, 362 (2d Cir.1973) (Lumbard, J., dissenting) (Although majority held that there was a requirement for individualized sentencing, it concluded that the district judge had satisfied it; the Honorable J. Edward Lumbard disagreed with their assessment of the facts in the particular case and set forth the requirement for individualized sentencing in detail.).

Moreover, this reflects the evolution of the due process clause, which has also undergone growth in this country. The evolution has come about with the creation of new rights based upon statutory or state created entitlements. These entitlements carry with them the expectation of process due before deprivation. As Professor Lawrence Tribe succinctly set forth:

For the first time, the Court recognized as entitlements interests founded neither on constitutional nor on common law claims of right but only on a state-fostered (and hence justifiable) expectation, as opposed to a mere hope, which was derived from "an independent source such as state law" or from "mutually explicit understandings." While these new "statutory entitlements "did not grant a constitutional right to governmental non-arbitrariness whenever benefits were being provided (since government remained free to foster *no* expectations in distributing its largess), they did serve to surround the "core" of liberty and property interests with a periphery activated, unlike the core, only by affirmative state choices, but secure, once activated against destruction without due process of law.

L. Tribe, American Constitutional Law § 10–9, at 515 (1978) (citations and footnotes omitted, emphasis in original).

■ Under our system for at least the last four decades, defendants have come to rely on and expect full consideration of their individualized cases. This expectation, based upon past practice and precedent, cannot now be rescinded by sentences of classification. Thus, when an individual

is sentenced, part of the process due him is consideration as an individual subject to and the product of the circumstances specific to him. This, indeed is the most vital function of the due process clause—to protect the individual from being subject to loss of liberty or property without fair consideration of his circumstances.

The idea that disparity in sentencing is always an evil to be corrected is thus constitutionally erroneous. Because no two individuals are identical, due process dictates some degree of disparity to insure fair treatment. Parenthetically, it is worth noting that no data has yet demonstrated the degree of the disparity and significance which the Commission and Congress have sought to eliminate. Although true guidelines—the type that guide as oppose to mandate—might be helpful to reach a determination within a range of penalties, a rigid set of rules with departure dictated only under specific circumstances, results in a determination based upon classification not individual upon the *qua* individual.

Under the Guidelines, however, the due process clause is violated because each defendant is considered only as a member of a class—i.e. an individual who committed x crime, who has x prior felony convictions (regardless of their exact nature). Further, the application of the mitigating and aggravating factors in the Guidelines fails to provide the requisite amount of individual consideration. As Judge Greene aptly put in his recent decision:

> the Act and the Commission's guidelines so restrict the court's discretion that they effectively negate it. *See Nixon v. Administrator of General Services*, 433 U.S. 425, 443 [97 S.Ct. 2777, 2790, 53 L.Ed.2d 867] (1977; *United States v. Klein*, 80 U.S. [ (13 Wall.) ] 128, 147, [20 L.Ed. 519] (1871). Defendants are in effect being sentenced not by a live judge

but by a book of guidelines written by a commission sitting far away.

*United States v. Brodie, supra,* 686 F.Supp. 941 (D.D.C.1988).

 Further, as sentencing requires a specific assessment of an individual and an individual's circumstances, as it involves an individual's constitutionally protected right to liberty, and as it is an adversarial process between the individual and the government, there is but one fundamental conclusion: sentencing, the terminal and most significant part of a criminal case, constitutes a case or controversy under Article III of the Constitution. Since it is a case or controversy, and since constitutional rights are involved, under *Northern Pipeline, supra*, it can only be disposed of by Article III judges. As a matter within the purview of the judicial branch it thus follows that the judge must be permitted to exercise judicial discretion. Thus, the concept that a book of guidelines renders a sentence imposed on any individual a *fait accompli*, before a judge ever sets eyes on the individual, is unconstitutional.[12]

Of course, the court recognizes that Congress has the power to prescribe mandatory minimum sentences, and has done so. *See, e.g.,* 18 U.S.C. § 3147 (anyone committing a crime while on release pending judicial proceedings must be sentenced to at least two years in prison in addition to any sentence he might receive); *see also Ex parte United States*, 242 U.S. 27, 42, 37 S.Ct. 72, 74, 61 L.Ed. 129 (1916); *Smith v. United States*, 284 F.2d 789, 791 (5th Cir. 1960). However, Congress has not removed judicial discretion from the sentencing process. *See e.g., Rodriguez v. United States*, 480 U.S. 522, 107 S.Ct. 1391, 94 L.Ed.2d 533 (1987) (per curium); although Comprehensive Crime Control Act required pre-guidelines minimum two year sentence for crime committed while on bail, judge is

---

**12.** The sentencing decision is distinguishable from the parole decision—one that may be granted administratively. Parole, an early release from confinement, is a legislatively granted privilege. It is not a right. The situation is analogous to the difference between revocation of parole and refusal to grant parole. The for-

mer a protected liberty interest because the individual is to be deprived of freedom, the latter not. *Compare Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) with *Greenholtz v. Inmates of Nebraska Penal & Correctional Complex*, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979).

still free to suspend execution of the sentence after its imposition if in his discretion the circumstances so warrant. This is not to say that courts should be omnipotent in prescribing punishment but only to say that the branches must share responsibility, leaving the courts, the branch most informed of the circumstances in any particular case, with ample discretion so as to assure that the punishment fits the offender and not merely the offense.

█ Moreover, whether an individual is deprived of due process by operation of the Guidelines is a question to be answered not by Congress, nor by the Commission. It is a question of constitutional interpretation and thus is to be answered by the judicial branch of government. *Marbury v. Madison*, 1 Cranch 137, 2 L.Ed. 60 (1803).

*Separation of Powers*

█ Our constitutional system was created in part to guard against despotism in the form of concentrated power and to insure individual rights of liberty and property. The former goal is attained through the separation of powers; the latter through the operation of the bill of rights. However, the concept of a Commission formed to execute the will of Congress and to promulgate legislative grids and classifications by which an individual's right to liberty will be determined violates the constitutional system as we know it.

The Honorable Peter K. Leisure and the Honorable Michael B. Mukasey in this district, the Honorable Thomas Eisele in the Eastern District of Arkansas, and the Honorable Harold Greene in the District of Columbia have demonstrated why the source of the guidelines, the Commission, and hence the Guidelines themselves, fail to pass muster under the doctrine of separation of powers. They have noted that a Commission set down by Congress to be part of the judiciary cannot constitutionally

be made up of members removable at the President's will, *Brittman, supra; Olivencia, supra,* 689 F.Supp. at 1324, cannot pass laws that some of its mandatory members may be called upon to adjudicate, *Brittman, supra,* and cannot contain as *ex officio* commissioners members of the executive branch, *Brodie, supra.* As these opinions establish, the Commission cannot judicially be deemed part of the executive branch at the request of the Justice Department[13] when Congress has specifically stated otherwise. *Id.* Even if it could, that would not cure the Commission's constitutional infirmities. *Id.; Olivencia, supra,* 689 F.Supp. at 1324–27.

However, the Commission wields the power of all three branches. The Commission has the power to make law by promulgating guidelines.[14] Congress itself did not have to adopt the guidelines affirmatively; the mere failure to act transformed them Guidelines into law. 18 U.S.C. § 3551. Moreover, the Commission, in effect, has created new offenses. For example, by creating a mandatory increase in penalties for repeat offenders, the Commission has created a federal recidivist statute wherein none to date existed. *See also Brittman, supra.*

The Commission executes the laws. In fact, the government in its memoranda of law[15] argues that "despite Congress' label, [the Commission] is within the Executive Branch by virtue of its function and composition." The Commission is empowered to execute the law created by Congress by interpreting that law and then implementing a policy. Such is the function of the executive branch. *See Bowsher v. Synar,* 478 U.S. 714, 106 S.Ct. 3181, 3192, 92 L.Ed. 2d 583 (1986); *see also Dibiase, supra,* 687 F.Supp. at 43.

The Commission also functions as part of the judiciary as Congress has said in its enabling legislation, 28 U.S.C. § 991(a), and

---

**13.** The government in both *Alafriz* and *Mercado & Perez* has asserted that the Commission is part of the executive branch. *See also Brittman, supra, Brodie, supra.* In briefs *amicus curiae* submitted in other cases the Commission itself claims to be part of the judiciary. *See, e.g., Olivencia, supra,* 689 F.Supp. at 1322.

**14.** This will be discussed in greater detail in the context of delegation of powers below.

**15.** Nearly identical memoranda were submitted in *Alafriz* and in *Mercado & Perez.*

as the Commission itself says. *See Oliven-cia, supra.* The Commission mandatorily includes judges as its members. 28 U.S.C. § 991(a) ("At least three of the members shall be Federal judges selected after considering a list of six judges recommended to the President by the Judicial Conference of the United States.") According to the Commission, it is performing judicial tasks by aiding in the judicial sentencing function. *Olivencia, supra,* 689 F.Supp. at 1325. In fact, the Guidelines themselves control and determine the sentencing phase of a criminal litigation and substitute for judicial discretion with respect to the determination of the factors relevant to a given case. This infringes on a judicial function and affects a judge's ability to adjudicate a case every bit as much as a predetermined rule regarding what constitutes prejudicial material under Rule 403 of the Federal Rules of Evidence would affect a judge's ability to try the guilt phase of a case. The fact the defendant has already been found guilty does not strip him of the right to be sentenced by an Article III court performing Article III functions. Thus the Commission is performing judicial functions.

This combination of functions and functionaries cannot help but run afoul of the Constitution. In *United States v. Brown,* the Supreme Court set forth the purpose behind our system of government:

> This "separation of powers" was obviously not instituted with the idea that it would promote governmental efficiency. It was, on the contrary, looked to as a bulwark against tyranny. For if governmental power is fractionalized, if a given policy can be implemented only by a combination of legislative enactment, judicial application, and executive implementation, no man or group of men will be able to impose its unchecked will. James Madison wrote:

The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny. 381 U.S. 437, 443, 85 S.Ct. 1707, 1712, 14 L.Ed.2d 484 (1965) (quoting The Federalist, No. 47, 373–74 (Hamilton ed. 1880)). The Commission and the Guidelines violate the very values the framers sought to promote.

*Delegation and the Analogy to the Administrative Agency*

This is not to say that Congress has no power to delegate authority. Congress has the power "to make all laws which shall be necessary and proper for carrying into Execution" its enumerated powers. U.S. Const. art. I § 8, cl. 18; *see also Immigration & Nationalization Service v. Chadha,* 462 U.S. 919, 983–84, 103 S.Ct. 2764, 2801, 77 L.Ed.2d 317 (1983) (White, J., dissenting) (citing Chief Justice Marshall's construction of the necessary and proper clause in *McCulloch v. Maryland,* 4 Wheat 316, 415–16, 420, 4 L.Ed. 579 (1819) as authority for Congress to delegate powers). Administrative agencies can perform legislative functions by rulemaking,[16] executive functions by carrying out the will of Congress,[17] and adjudicative functions by resolving disputes within their sphere of power.[18]

However, these agencies do not perform their functions unchecked. Courts will review agencies and their actions to be certain that they are not performing pursuant to an unlawful delegation of power, they will often review the facts and law pursuant to which an agency decision was made, and they will review the agency action to be sure it was performed in accordance with the Administrative Procedure Act, 5 U.S.C. § 551 *et seq. See In re Chateaugay Corp.,* 87 B.R. 779, 807–808 (S.D.N.Y.1988).

**16.** For example, the Interstate Commerce Commission is charged with determining the reasonableness of carrier rates. 49 U.S.C. § 10704.

**17.** For example, Congress created the office of Federal Procurement Policy as an executive agency within the Office of Management and Budget to provide efficient procurement poli-cies, regulations and procedures in accordance with federal laws. 41 U.S.C. § 401.

**18.** For example, the National Labor Relations Board initially resolves labor disputes. 29 U.S.C. § 160.

■ Under the non-delegation doctrine, Congress cannot delegate its core power to legislate. Legislation empowering agencies to create rules must set forth adequate rulemaking guidelines thus defining the scope of the rules the agency can make, while providing a basis for judicial review. *See e.g., Yakus v. United States*, 321 U.S. 414, 426, 64 S.Ct. 660, 668, 88 L.Ed. 834 (1944). Although the Supreme Court has not invalidated legislation as an overbroad delegation of authority since 1935, *see A.L.A. Schecter Poultry Corp. v. United States*, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935); *Panama Refining Co. v. Ryan*, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935), recent decisions have suggested that the doctrine still retains vitality.

Justice Rehnquist in his concurring opinion in *Industrial Union Department v. American Petroleum Institute*, 448 U.S. 607, 671–688, 100 S.Ct. 2844, 2878–2888, 65 L.Ed.2d 1010 (1980), found that the mandate set forth in the Occupational Safety and Health Act of 1970 failed to pass constitutional muster under the non-delegation doctrine. He described the doctrine thus:

> As formulated and enforced by the Court, the nondelegation doctrine serves three important functions. First, and most abstractly, it ensures to the extent consistent with orderly governmental administration that important choices of social policy are made by Congress, the branch of our Government most responsive to the popular will.... Second, the doctrine guarantees that, to the extent Congress finds it necessary to delegate authority, it provides the recipient of that authority with an "intelligible principle" to guide the exercise of the delegated discretion.... Third, and derivative of the second, the doctrine ensures that courts charged with reviewing the exercise of delegated legislative discretion will be able to test that exercise against ascertainable standards.

*Id.* at 685–86, 100 S.Ct. at 2885–86 (citations omitted).

In *National Cable Television v. United States*, 415 U.S. 336, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974), the petitioner claimed that a fee levied by the Federal Communications Commission was actually a tax and thus that Congress had unconstitutionally delegated its taxing power. While the Court held that the levy was indeed a fee and not a tax and thus did not directly address the delegation issue, in describing the difference between a tax and a fee the court stated that "Taxation is a legislative function, and *Congress, which is the sole organ for levying taxes*, may act arbitrarily ... based on property or income." *Id.* at 340, 94 S.Ct. at 1149 (emphasis added).

Although the mandate provided the Commission may not be unduly broad,[19] it violates nondelegation principles by giving the Commission the authority to, as Justice Rehnquist has stated, make "important choices of social policy." The authority to set forth to what extent a person may be deprived of his or her liberty is one of the gravest policy choices a legislature can make. Although the power to create and punish federal crimes is not specifically enumerated as is the taxing power, laws providing for a deprivation of liberty must be enacted by an accountable body every bit as much as laws providing for a deprivation of property. *See Whalen v. United States*, 445 U.S. 684, 689, 100 S.Ct. 1432, 1436, 63 L.Ed.2d 715 (1980) ("[W]ithin our federal constitutional framework the legislative power, including the power to define criminal offenses and to prescribe the punishments to be imposed upon those found guilty of them, resides wholly with the Congress.")

■ Indeed, as Judge Eisele wrote in *United States v. Brittman, supra*, the power to define crime and punishment is a "core legislative field, ... an area affecting the most fundamental of Constitutional rights." This court thus adheres to his determination that "the Sentencing Reform Act delegates both the power to establish penalties for violations of Federal law and the power to define criminal conduct. Both

---

**19.** The mandate, set forth above, is more specific that some that have been upheld by the court as not excessively broad. *See, e.g., Yakus, supra.*

of these areas lie within the limited sphere where Congress cannot constitutionally delegate its authority." *See generally,* K. Davis, Administrative Law Treatise § 3:1–2 (Supp.1982).

Additionally, most delegated agency action is subject to judicial review under the Administrative Procedure Act ("APA").[20] APA review can only be avoided if the statute creating the agency explicitly says so, or if the statute is drawn so broadly that there is no law to apply. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971). Only a clear legislative intent that the agency action is unreviewable will preclude judicial review. *Id.* (citing *Abbott Laboratories v. Gardner,* 387 U.S. 136, 141, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967)).

However, the Commission's position is so precarious it is not clear whether or how it fits into the review scheme of the APA.[21] The only method of review is prescribed by the Guidelines themselves. The district court may review the Probation Department's Guidelines calculations to see if they or accurate, or it may depart from the prescribed sentence for factors not adequately considered by the Commission. The courts of appeals may thus review on similar grounds.

This is so even though applying the factors the Commission claims to have adequately considered may lead the courts themselves to create arbitrary and capricious results, and yet the court has little alternative. Judge Eisele sets forth an astute example. In his hypothetical situation, a defendant with a criminal history of three purse snatchings, a violent crime under state law, must be increased the same number of points as a defendant with three prior murder convictions, also obviously a violent crime. This result seems arbitrary and capricious, yet a court cannot apply the protections of the APA to avoid applying the Guidelines.[22]

For these reasons, Congress has improperly and unconstitutionally delegated its authority to the Commission.

## Conclusion

The Sentencing Commission, and the Guidelines it has promulgated, run afoul of the Constitution in several ways. The creation of the Commission violates separation of powers and the non-delegation doctrine. The Guidelines themselves impinge on a defendant's due process right to be considered as an individual during the sentencing process and prevent courts from performing their Article III function in carrying out that process. While there is a check on district courts through the appellate process, the courts of appeals too are constrained by the operation of sentencing legislation and the Guidelines.

While true guidelines in sentencing— those that guide and do not order—may be a desirable thing, and while appellate re-

---

**20.** 5 U.S.C. § 702 provides:
A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency actin within the meaning of a relevant statute, is entitled to judicial review thereof. . . .
5 U.S.C. § 704 provides:
Agency action made reviewable by statute and final agency action for which there is not other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. . . .

**21.** Under the APA, a court can:
(2) hold unlawful and set aside agency action, findings, and conclusions found to be—
 (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

 (B) contrary to constitutional right, power, privilege, or immunity;
 (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
 (D) without observance of procedure required by law;
 (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
 (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

**22.** Nor would this be considered grounds for departure since prior convictions is a category considered by the Commission.

view thus bringing about a common law of sentencing could result in more of a common ground in nationwide sentences, existing law not only does not achieve this end but impermissibly impacts on our system of government and the rights of individuals.

This court thus holds that the Sentencing Commission and the Sentencing Guidelines are unconstitutional, and the defendants in the cases before the court will be sentenced under pre-guideline standards.

IT IS SO ORDERED.